**UNITED STATES of America, Appellee,**

**v.**

**Wilson Paul PERKINS, Appellant.**

**No. 90–1983.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1990.

Decided April 4, 1991.

John R. Buergler, Fort Smith, Ark., for appellant.

Mark W. Webb, Fort Smith, Ark., for appellee.

Before WOLLMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and FRIEDMAN,* Senior Circuit Judge.

WOLLMAN, Circuit Judge.

Wilson Paul Perkins appeals his sentence of 84 months' imprisonment that the district court[1] imposed following Perkins' guilty pleas to two counts of credit card fraud and one count of fraud by wire. We find adequate support in the record for the district court's departure from the Sentencing Guidelines and affirm Perkins' sentence.

**I.**

Between July and October 1989, while on probation for past frauds, Perkins obtained a Citicorp Diners Club credit card under a false name and charged approximately $3,260 worth of goods and services. Dur-

---

* The HONORABLE DANIEL M. FRIEDMAN, United States Senior Circuit Judge for the Federal Circuit, sitting by designation.

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

ing the same period, Perkins fraudulently obtained credit from Contel Cellular Store, Sears, and General Electric, and ordered merchandise worth approximately $22,534. Perkins deposited four checks totaling $6,500 into bank accounts opened under false names and withdrew $1,100 before the checks were returned for insufficient funds. Between April and August 1989, Perkins used false identities and opened accounts with U.S. Sprint, My Girl Friday answering service, Blair Company in Pennsylvania, and CVN Television Shopping Channel in Minnesota, leaving a total outstanding balance of approximately $1,500. A few payments were made to these false credit accounts by bad checks written by Perkins in the name of John E. Baker.

Perkins' criminal record spans close to fifteen years of thefts and forgeries. His remarkable history of fraud incorporates a proclivity toward other people's identities. Perkins used nine different social security numbers and fraudulently obtained seventeen credit cards under various names. Unfortunately for a few of his victims, Perkins preferred some identities more than others and used them to perpetrate a disproportionate amount of fraud in their names. John Edward Baker is one of those victims.

In 1981, Perkins used Mr. Baker's name to pass insufficient funds checks. That same year, Perkins used Mr. Baker's name and identity to gain employment, then was arrested for the theft of office machines from that employer. John Baker's name falsely appears on records of aggravated robbery investigations in Texas in 1981 and for shoplifting and passing bad checks in 1982. Perkins apparently intended to assume John E. Baker's name and identity on a permanent basis, for in March 1982, he married under that feigned identity. Perkins' two children from that marriage are named Baker also.

Compounding an already complex history of deceit, Perkins came into possession of John Baker's authentic identification in 1983 and thereby obtained Mr. Baker's col-lege transcripts from the University of Mississippi and Southern Methodist University. Using Mr. Baker's transcripts, social security number, birth date, and complete identification, Perkins enrolled in a doctorate program at the University of Arkansas and fraudulently obtained a student loan. Perkins' crime was not discovered until the true John Baker was contacted by the University of Arkansas to secure payment of the fraudulently obtained loan. Mr. Baker's records at the University of Arkansas have never been expunged and reflect the incompletes and failing grades Perkins put there, despite Mr. Baker's efforts to explain Perkins' fraud.

Perkins again used John Baker's identification in 1985, while on probation following his incarceration for the 1981 and 1982 crimes. This time, Perkins used Mr. Baker's name to purchase a security system from Rollins Protective Services and a computer from Sears. Upon discovery of the 1985 scheme, Perkins' probation was revoked in 1986 and he was incarcerated. Perkins was released from prison on July 28, 1989. Perkins began his most recent series of crimes within days of being released and once again used John Baker's identity to establish fraudulent credit.

## II.

The Sentencing Guidelines range suggested for Perkins' crimes is 30–37 months. The district court increased Perkins' sentence to 84 months' imprisonment based on the Guideline's objective of deterring crime and the exceptional financial and emotional hardship to John E. Baker. We note that the total sentence of seven years' imprisonment is less than one-third of the statutory maximum of twenty-five years for the three counts to which Perkins pleaded guilty.[2]

The district court may depart from the Guidelines if it finds aggravating or mitigating circumstances which are not adequately taken into consideration by the Guidelines, 18 U.S.C. § 3553(b), and it pro-

---

**2.** Ten years on each of the two counts of credit card fraud (18 U.S.C. § 1029(c)(1)), and five years on the wire fraud count (18 U.S.C. § 1343).

vides the specific reason for the departure. 18 U.S.C. § 3553(c). We review the reasonableness of an upward departure based on circumstances not adequately considered by the Guidelines under an abuse of discretion standard. *United States v. Carey*, 898 F.2d 642, 645 (8th Cir.1990); *United States v. Drew*, 894 F.2d 965, 974 (8th Cir.1990), *cert. denied*, —— U.S. ——, 110 S.Ct. 1830, 108 L.Ed.2d 959 (1990). This review is "quintessentially a judgment call" and we respect the district court's superior "feel" for the case. *United States v. Snover*, 900 F.2d 1207, 1211 (8th Cir.1990).

The district court concluded that Perkins' actions caused Mr. Baker extreme psychological injury, Guidelines § 5K2.3, property damage and other damage not taken into account, Guidelines § 5K2.5, and that Perkins' conduct was unusually cruel, brutal, or degrading, Guidelines § 5K2.8. We agree with the district court that Perkins ruined Mr. Baker's academic record and has "ruined and muddied and s[u]llied forever" Mr. Baker's identity. What Perkins did to Mr. Baker and his family is reprehensible, and although the sentence imposed is lengthy, it was not an abuse of discretion for the district court to consider the impact of Perkins' crimes on his victim.

We agree with the district court that Perkins' crimes entailed aggravating circumstances which were not taken into consideration by the Guidelines and thus warranted an upward departure. Perkins has not once completed a term of supervised release or probation without returning to his pattern of criminal activity and committing the same types of offenses against the same person without any regard for the consequences to himself or Mr. Baker. The Guidelines were not drafted in anticipation of this type of behavior and were certainly not designed to permit the Perkinses of this world to escape condign punishment for their crimes.

John E. Baker has spent years attempting to clear his good name. We agree with the district court that some peace of mind may return to Mr. Baker if Perkins is unable to further sabotage Mr. Baker's character. In the meantime, perhaps John Baker will have the chance to restore his personal and academic reputation and to reestablish his solid credit rating, the latter attribute having in this next-to-cashless society a value approaching that inherent in a good name and most certainly exceeding that of the Bard's purse.

The sentence imposed by the district court is affirmed.

HEANEY, Senior Circuit Judge, concurring.

I concur in the result the majority reaches only because I believe that district courts must have considerable discretion to depart upward or downward from the guidelines. Had I been the sentencing court, however, I would not have doubled the authorized guidelines sentence.

In departing from the guidelines, the district court noted that Perkins had never completed a term of probation or supervised release without again committing the same type of offense for which he previously had been punished. I agree with the district court that Perkins' repeated commission of the same type of offense can be a factor not adequately considered by the guidelines, and therefore a valid reason to depart. *See United States v. Carey*, 898 F.2d 642, 646 (8th Cir.1990) (affirming upward departure based on deterrence necessitated by defendant's obvious incorrigibility); *see also United States v. Chavez-Botello*, 905 F.2d 279, 281 (9th Cir.1990) (permitting upward departure because similarity between prior and current offenses is not considered in computing criminal history score).

Perkins' demonstrated inability successfully to complete a term of noncustodial supervision, however, is adequately accounted for in his criminal history score. Perkins had a criminal history score of fourteen points, which placed him in criminal history category VI. Perkins received three of the fourteen points for committing the instant offense while on parole and less than two years after his most recent release from prison. These three points moved Perkins from criminal history category V into criminal history category VI.

Moreover, the guidelines account for revocations of probation and parole by requiring that the sentence imposed upon revocation be added to the original term of imprisonment for purposes of computing an offender's criminal history. *See* U.S.S.G. § 4A1.2(k)(1). Perkins' criminal history score included such computations. Accordingly, I do not believe that Perkins' repeated failure to complete a term of probation or parole constitutes an aggravating factor not adequately taken into consideration by the guidelines.

The district court also premised its departure on the extreme psychological injury Perkins' crimes inflicted on John E. Baker. The guidelines approve this basis for departure with the following caveat:

> Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns.

U.S.S.G. § 5K2.3 (policy statement). The district court relied in its departure on Baker's statement describing the impact Perkins' crimes have had on his life. Baker's statement reveals a harrowing degree of disruption to his credit and academic records and great personal expense and inconvenience in trying to eliminate the misinformation Perkins placed there. The statement does not disclose, however, any evidence of substantial impairment of Baker's intellectual, psychological, emotional, or behavioral functioning manifested by physical or psychological symptoms or changes in behavior patterns. Indeed, Baker's primary reactions to the havoc Perkins has created in his life appear to be anger and a desire for restitution, normal intellectual and emotional responses to Perkins' crimes. Accordingly, I do not believe that an upward departure based on extreme psychological injury to Baker is warranted.

I agree with the district court that Perkins' extreme conduct toward Baker and the property damage or loss Baker incurred are appropriate grounds for an upward departure. I do not agree, however, that these grounds are sufficient to support a departure of 47–54 months, more than twice the authorized guidelines sentence and the equivalent of an increase of eight offense levels.

Perkins' offense level of 12 already reflects a two-level increase for a scheme to defraud more than one victim and a four-level increase for intended losses of more than $30,000 under the fraud guideline, section 2F1.1. While the four-level increase and the $30,000 figure concededly do not account for all the harm Perkins' offenses have caused Baker, the guidelines' graduated scale of offense-level increases for dollar losses due to fraud can provide some guidance on structuring a departure from the fraud guideline. *See* U.S.S.G. § 5K2.5 ("The extent of the increase [above the authorized guideline range] ordinarily should depend on the extent to which ... the harm to property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction."). This scale also illuminates the harshness of the magnitude of the departure in Perkins' case.

The sentence Perkins received was within the guidelines range for an offense level of 20. In order for the court to assign Perkins an offense level of 20 under the guidelines, it would have to have calculated an intended loss of more than $1,500,000 from Perkins' crimes. *See* U.S.S.G. §§ 2F1.1(a), (b)(1)(M), (b)(2) (base offense level of 6 plus 12 levels for dollar loss plus 2 levels for scheme to defraud more than one victim). Perkins thus received a sentence commensurate with an intended dollar loss fifty times that attributable to his crimes. While the harm done to Baker is both great and difficult to quantify, equating it with an intended loss of more than $1.5 million seems excessive, particularly when the actual dollar loss inflicted on Perkins' victims was only $7,837.47.

Reference to another recent fraud case also illustrates the harshness of the district court's departure here. Had financier Michael Milken's offenses been subject to the guidelines, he, too, would have been sentenced under guideline section 2F1.1. *See* 3 Fed.Sent.R. 164–65 (1990). He would have had a base offense level of 6 and probably would have received a two-level increase for more than minimal planning and a four-level increase for his role in the offense. *See id.* If the loss attributable to his crimes exceeded $80 million, he would have received an additional 18-level increase, yielding an offense level of 30. *See id.* At a criminal history category of I, Milken would have had a guidelines range of 97–121 months.[3] *See id.* In view of these calculations, Perkins' sentence of 84 months seems grossly disproportionate to his offenses, even considering the prolonged pain or humiliation Baker has suffered as a consequence of Perkins' extreme conduct. *See* U.S.S.G. § 5K2.8.

Despite misgivings about the degree of departure from the guidelines in this case, I concur to reaffirm my view that the district courts are best equipped to determine which cases merit departures from the guidelines and must be given ample discretion to do so. *See United States v. Prestemon*, 929 F.2d 1275, 1278–80 (8th Cir. 1991) (Heaney, J., dissenting). Unfortunately, the boundaries of this discretion appear to expand and contract at the whim of the reviewing court. In this case, we affirm an upward departure of four years, more than twice the authorized guidelines sentence. In *Prestemon*, we reversed a downward departure of only nine months, representing a reduction from the guidelines range of less than twenty-five percent. *See Prestemon*, 929 F.2d at 1276. Results such as these send mixed messages to the district courts and do little to further the guidelines' goals of fairness and rationality in sentencing.

---

**3.** Milken was, of course, sentenced under preguidelines law, although the sentencing court referred to the guidelines for direction in fixing his sentence. *See United States v. Milken*, No. 89 Cr. 41 (S.D.N.Y. Nov. 21, 1990), 3 Fed.Sent.R. 158, 161 (1990), 1990 WL 264699. Milken received a sentence of ten years imprisonment. *Id.*, 3 Fed.Sent.R. at 162. He will be eligible for parole after serving one-third of his sentence. *See* 18 U.S.C. § 4205(a) (1982) (repealed by Pub.L. No. 98–473, title II, §§ 218(a)(5), 235, 98 Stat. 2027, 2031 (1984)). Additionally, the sentencing court left open the possibility of reducing Milken's sentence at some future time if Milken cooperates with the government and the government moves for such a reduction. 3 Fed. Sent.R. at 162. Even without a reduction of his ten-year sentence, Milken is likely to serve no more than four and one-half years in prison. *See* U.S. Dep't of Justice, Federal Bureau of Prisons, Statistical Report, Fiscal Year 1986, at 12 (1987) (indicating that average time served by federal prisoners as a percentage of the sentence imposed varied from 44% to 45.9% in the years 1982 through 1986). Thus, Milken will serve less time in prison than will Perkins, despite his fraud's greater magnitude and larger number of victims.