**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lavandris JOHNSON, Defendant– Appellant.**

No. 94–2958.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1995.

Decided June 8, 1995.

---

William S. Margulis, St. Louis, MO, argued, for appellant.

Joseph M. Landolt, Asst. U.S. Atty., St. Louis, MO, argued, for appellee.

Before BOWMAN, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.

HANSEN, Circuit Judge.

Lavandris Johnson appeals his convictions and sentences on four counts of armed robbery of a motor vehicle (the carjacking counts), in violation of 18 U.S.C.A. § 2119 (West Supp.1993), and four counts of possession of a firearm during a crime of violence (the gun counts), in violation of 18 U.S.C.A. § 924(c)(1). Johnson contends that the district court committed error by admitting into evidence the results of DNA testing, by denying his motions to suppress witness identification testimony and certain statements he made to authorities, and by denying his motion for judgment of acquittal on one carjacking count. Johnson also contends that the district court erred by failing to dismiss the gun counts on double jeopardy grounds and by granting the government's motion for an upward departure at sentencing. We affirm in part and reverse in part.

## I. BACKGROUND.

Early in the morning of January 28, 1993, Lavandris Johnson went on a carjacking spree in St. Louis, Missouri. At about 6:55 that morning, Johnson approached the driver's side window of a white Oldsmobile in which Betty Williams was sitting, pointed a gun at her, and told her to get out of the car. After Ms. Williams complied with the demand, Johnson drove away toward downtown St. Louis.

At approximately 7:15 a.m., Johnson, armed with a gun, approached Mary Jo Stobie as she was getting out of her Jeep in the Famous Barr parking garage (approximately 11 minutes away from Ms. Williams's home). Johnson told Ms. Stobie not to look at him and threatened to kill her. Johnson then forced her into the white car he had stolen from Ms. Williams. When Johnson was unable to get the car started again, he ordered Ms. Stobie back into her Jeep and again threatened to kill her. Johnson hit Ms. Stobie on the side of her face with the gun as a blue station wagon was entering the ramp and hit her again on the back of her head as she stumbled to the ground. Ms. Stobie ran from Johnson into the store to get help and was taken to the hospital for treatment.

Robert Crutcher, the driver of the blue station wagon, saw Johnson hit Ms. Stobie and saw Ms. Stobie run from the garage. Johnson then approached Mr. Crutcher brandishing a gun and ordered Mr. Crutcher out of the car. As he complied, Johnson struck him with the gun, leaving him unconscious in the parking garage. When Mr. Crutcher regained consciousness, his car was gone.

At approximately 7:35 a.m., 18–year–old Katie Kientzy, ready for school, got into her car on the street in front of her house in south St. Louis (about 12 to 13 minutes away from the Famous Barr parking garage). Johnson drove up in the blue station wagon and blocked Miss Kientzy in her parking space. Johnson approached her with a gun and forced his way into her car. As he started driving, Johnson told Miss Kientzy that he had been sent to kill her and was on a mission from God. Johnson punched her in the face when she looked at him and threat-

ened to kill her if she looked at him again. Johnson then made her get on the floor and cover her head with her coat. He hit her with his gun and forced her to perform oral sex as he drove. When she protested, he slapped her and threatened to kill her again.

Johnson took Miss Kientzy to an abandoned building near his residence where he bound her hands and feet and covered her eyes with her own clothing. For the next 1½ hours, Johnson repeatedly raped, sodomized, slapped, and hit Miss Kientzy. At one point, Johnson forced his gun into her rectum, cocked the gun, and asked if it would hurt if he shot her. After removing the gun, Johnson kicked Miss Kientzy in the tailbone. Throughout this time, Johnson also told her that now she knew how it felt to be dehumanized and that there were fourteen others waiting outside for their turn with her. Johnson also threatened to harm Miss Kientzy's family. Finally, he left her in the building with instructions to wait five minutes before leaving.

Dr. Anne Marie Rockaman examined Miss Kientzy at the hospital and treated her injuries. She discovered several abrasions on Miss Kientzy's stomach, upper thighs, knees, and back, as well as bruising and severe lacerations around her genitalia and anus. In Dr. Rockaman's opinion, Miss Kientzy's injuries involved a substantial risk of death from bleeding. Dr. Rockaman completed a rape kit, which included samples of the victim's hair and body fluids. The police department laboratory gathered samples of human spermatozoa from Miss Kientzy's clothes.

The police found Ms. Williams's white Oldsmobile in the Famous Barr parking garage, and Johnson's apartment keys were lying on the passenger's seat. The police found Mr. Crutcher's blue station wagon on the block where Miss Kientzy lives, and Ms. Williams's keys and whistle were on the floor.

On June 27, 1993, St. Louis Police arrested Johnson, found hiding in the attic of an apartment. The police informed Johnson of his rights. Johnson refused to sign a waiver of rights form, but after being informed

again of his rights by Special Agent Henry Vera of the Federal Bureau of Investigation (FBI), he agreed to talk. Johnson made some statements to Special Agent Vera before terminating the interrogation.

Donna Becherer, DNA Section Supervisor of the St. Louis Police Department Laboratory, performed DNA testing on the stains found on Miss Kientzy's clothes, on Miss Kientzy's blood sample, and on a sample of Johnson's blood. Becherer used a technique called Restriction Fragment Length Polymorphism (RFLP) and the DNA/RFLP protocol developed by the FBI. She concluded that Johnson could have been the source of the stains and that only one person out of 465 in the general population would have a similar DNA profile.

A jury convicted Johnson on all eight counts of a superseding indictment—four carjacking counts and four gun counts of possessing a firearm during a crime of violence. *See* 18 U.S.C.A. §§ 2119 (West Supp. 1993); 18 U.S.C.A. § 924(c)(1). At sentencing, the district court granted the government's motion for an upward departure pursuant to United States Sentencing Commission, *Guidelines Manual*, §§ 5K2.3 and 5K2.8 (Nov.1993). The district court sentenced Johnson to a term of 1,253 months of imprisonment to be followed by a three-year term of supervised release, a fine of $4,000, and a $400 special assessment.

## II. DISCUSSION.

Johnson appeals all his convictions and sentences. He claims that the district court erred in admitting the DNA evidence, in denying his motions to suppress statements and out-of-court identifications, in denying his motion for judgment of acquittal on one carjacking count, in denying his motion to dismiss on the basis of Double Jeopardy, and in granting the government's motion for an upward departure at sentencing. We address each issue in turn.

### A. DNA Evidence.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——–——, 113 S.Ct. 2786, 2795–99, 125 L.Ed.2d 469 (1993),

the Supreme Court described the proper standard by which trial courts can determine whether scientific testimony is admissible. The trial court must determine (1) whether the testimony is based upon reliable scientific knowledge, and (2) whether it will assist the trier of fact. *Id.* ——, 113 S.Ct. at 2796. *See* Fed.R.Evid. 702.

Since *Daubert*, we have determined that the general theory and techniques of DNA profiling are reliable under *Daubert*, and we have held that "in the future, courts can take judicial notice of their reliability." *United States v. Martinez,* 3 F.3d 1191, 1197 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 734, 126 L.Ed.2d 697 (1994) *adopting United States v. Jakobetz,* 955 F.2d 786, 799–800 (2d Cir.1992) (holding FBI RFLP analysis reliable). Yet, "there must be a preliminary showing that the expert properly performed a reliable methodology in arriving at his opinion." *Id.* at 1197–98. Also, if a new DNA technique is used, the district court must hold a hearing to determine its reliability under the standards of *Daubert*. *Id.* at 1197.

The district court held a two-day evidentiary hearing to determine the admissibility of the DNA evidence. Johnson challenged the reliability of the St. Louis Police Department protocol, contending that it varies substantially from the generally accepted FBI protocol. The district court concluded that the protocol used by the St. Louis Police Department for RFLP DNA testing was sufficiently reliable and that the conflicting testimony elicited at the hearing went to the weight, not the admissibility, of the DNA evidence.

■ Johnson contends that the district court erred in admitting the DNA evidence at trial, arguing that the St. Louis Police Department protocol is sufficiently different from the FBI protocol to render the results in this case unreliable and that this "new" protocol has not been validated as a reliable new method through proper empirical studies. We review a trial court's admission of DNA evidence for an abuse of discretion. *See Martinez*, 3 F.3d at 1198.

Donna Becherer, who performed the DNA testing in this case, testified that the St.

Louis Police Department protocol is based on the FBI protocol. Dr. Harold Deadman, Supervisory Special Agent of the FBI, who supervises the FBI's DNA Analysis Unit, testified that the St. Louis Police Department protocol is very similar to the FBI protocol and that the differences between the two would produce no meaningful differences in DNA testing results. He testified that some of the differences are probably beneficial in the quest for obtaining reliable results. Dr. Deadman also explained that the procedures used to conduct DNA analysis are not set procedures that must be followed exactly: "For example, the extraction of DNA, there are probably 50 procedures that you could take out of the scientific literature and use to extract DNA, which would be suitable for conducting this type of analysis. The same would hold true for other steps." (Trial Tr., Vol. 2 at 171.)

Johnson's expert witness, Dr. Randall Libby, testified that the St. Louis Police Department did not follow the FBI protocol, and he went through several steps of the procedure noting the variations. Dr. Libby stated that although the protocol used in Johnson's case might be reliable, it has never been verified through validation studies. On cross-examination, Dr. Libby acknowledged, however, that it is more likely for a mistake to result in a false negative than a false positive. (Trial Tr., Vol. 2 at 131.)

■ Our review convinces us that the evidence supports the district court's conclusion that the St. Louis Police Department protocol was not a new method but was substantially the same as the FBI protocol. The minor variations in some steps of the procedure did not negate its basis for reliability. *See Martinez,* 3 F.3d at 1198 ("alleged error in the application of a reliable methodology should provide the basis for exclusion of the opinion only if that error negates the basis for the reliability of the principle itself"). The district court was entitled to credit Dr. Deadman's testimony that the variations were minor and would not substantially undermine the results. Dr. Libby's testimony to the contrary went more appropriately to the weight than to the admissibility of the scientific evidence in this case. "Vigorous

cross-examination, presentation of contrary evidence, and careful instruction on the burdens of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* —— U.S. at ——, 113 S.Ct. at 2798. Additionally, there was a sufficient preliminary showing that Donna Becherer properly performed the protocol. Johnson challenged only the method itself, not the faithfulness of the examiner to the protocol. Thus, the first *Daubert* element for admissibility, that of scientific reliability, was satisfied.

Johnson did not argue that the DNA evidence would not assist the jury (the second *Daubert* element). Accordingly, we conclude that the district court did not abuse its discretion by admitting the DNA evidence and expert testimony offered by the government.

### B. Identification Procedures.

■ Johnson next contends that the district court erred by denying his motion to suppress identification evidence, arguing that the pretrial identification procedures were unnecessarily suggestive, tainted the witnesses' in-court identification, and thereby violated his constitutional right to due process. We review federal constitutional questions de novo. *United States v. Buckner,* 894 F.2d 975, 978 (8th Cir.1990).

■ To test the reliability of identification procedures, we apply the two-part test adopted by the Supreme Court in *Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). *United States v. Murdock,* 928 F.2d 293, 297 (8th Cir.1991). First, we consider whether the identification procedures were impermissibly suggestive. *Id.* Second, if the procedures were impermissibly suggestive, we look to the totality of the circumstances to determine whether "the suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'" *Id.* (quoting *Manson,* 432 U.S. at 116, 97 S.Ct. at 2254).

■ Johnson contends that the photo spreads in this case were unnecessarily suggestive because the officers showed the witnesses two different photo spreads, and Johnson's photo was the only one to be in-

cluded in both. We disagree. Before Johnson was a suspect, Ms. Williams and Mr. Crutcher each picked one photo, the *same* photo out of over 400 pictures as the man who most resembled the perpetrator (Johnson was not yet included in the photos). Once Johnson became a suspect, the police prepared two photo spreads, each including one picture of Johnson and one including the man whom both witnesses had earlier identified as most resembling the perpetrator. Ms. Williams and Mr. Crutcher each identified Johnson as the perpetrator in both photo spreads. Ms. Stobie identified Johnson in one of the two photo spreads.

Our de novo review of the record convinces us that the photo spreads were not impermissibly suggestive. The photo spreads were comprised of African–American men with similar features. There was no evidence of any prompting or suggestion from the officer on any occasion, and the photo of the man whom Ms. Williams and Mr. Crutcher had earlier identified as looking like the suspect was included in one of the photo arrays. The witnesses were never shown only a single photograph, which we have held to be impermissibly suggestive. *See Ruff v. Wyrick,* 709 F.2d 1219, 1220 (8th Cir.1983). We see nothing to indicate that the photo spreads were suggestive in any way.

■ Police conducted two lineup procedures before trial, which Johnson contends were inherently suggestive. At the first lineup, the five witnesses participating were placed together in the same room before viewing the lineup, which Johnson contends gave them an opportunity to discuss the case with each other. Three witnesses individually identified Johnson as the perpetrator at the first lineup.[1]

Although the witnesses were together in the same room before viewing the lineup, each witness viewed the lineup individually and those who had seen the lineup were segregated from and did not confer with those who had not. Further, Johnson was allowed to pick his position in the lineup, he appeared with other African–American males who had similar physical characteristics, and

he was represented by counsel. We conclude that this procedure was not inherently or impermissibly suggestive.

■ Johnson contends that the second lineup procedure was inherently suggestive because he was the only person in the lineup wearing a jail uniform. Johnson was dressed in a jail uniform consisting of a dark blue shirt and dark blue pants while others in the lineup wore street clothes. Ms. Stobie was the only witness present, and she identified Johnson as the perpetrator. Although Johnson's clothing bore no markings of the jail, we will nevertheless assume, arguendo, that this procedure was impermissibly suggestive.

■ We then consider "whether, under the totality of the circumstances, the suggestive procedures created 'a very substantial likelihood of irreparable misidentification.'" *Murdock,* 928 F.2d at 297 (quoting *Manson,* 432 U.S. at 116, 97 S.Ct. at 2254). Factors to consider in this analysis are: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description; (4) the witness's level of certainty at the lineup; and (5) the length of time between the crime and the lineup. *Manson,* 432 U.S. at 114, 97 S.Ct. at 2253.

Ms. Stobie had a good opportunity to closely view the criminal for a short period of time during the crime. She had given a prior description and had identified Johnson in a photo spread shortly after the crime. Further, Ms. Stobie was not aware that any persons in the lineup were in custody. Considering the totality of the circumstances, we conclude that the procedures of this lineup did not result in substantial likelihood of irreparable misidentification. Thus, we conclude that Johnson's constitutional rights were not violated by any of the pretrial identification procedures.

## C. Statements Made to Officers.

■ Johnson contends that the district court erred by denying his motion to sup-

---

1. Mr. Crutcher later admitted that he had inadvertently glanced at a newspaper picture of Johnson for an instant prior to the lineup, but stated that it did not affect his identification.

press certain statements he made to FBI Special Agent Vera when he was in custody. Johnson argues that Agent Vera violated the Fifth Amendment by continuing to question him after he invoked his right to remain silent. " 'We review the district court's decision to deny the defendant's motion to suppress under a clearly erroneous standard.' " *United States v. McClinton*, 982 F.2d 278, 281 (8th Cir.1992) (quoting *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir. 1990)). We will affirm unless the district court's decision is "unsupported by substantial evidence, based on an erroneous interpretation of applicable law, or, in light of the entire record, we are left with a firm and definite conviction that a mistake has been made." *Id.* (internal quotations and citations omitted).

■■■■■ The Fifth Amendment privilege against self-incrimination is safeguarded after arrest by the mandatory warning procedures outlined in *Miranda v. Arizona*, 384 U.S. 436, 467–79, 86 S.Ct. 1602, 1624–30, 16 L.Ed.2d 694 (1966). After giving *Miranda* warnings to a suspect in custody, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473–74, 86 S.Ct. at 1627. "[A] person's 'right to cut off questioning' " is central to the Fifth Amendment, and this right must be " 'scrupulously honored.' " *Michigan v. Mosley*, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975) (quoting *Miranda*, 384 U.S. at 474, 479, 86 S.Ct. at 1628, 1630). To adequately invoke this right and effectively cut off questioning, a suspect must indicate "a clear, consistent expression of a desire to remain silent." *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989). We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent. *See id.*

Johnson never indicated a clear or unequivocal desire to remain silent. The authorities repeatedly informed Johnson of his rights, both orally and in writing, and Johnson acknowledged that he understood them. When Agent Vera read the waiver portion of the form to determine if Johnson wished to waive his rights, Johnson gave no direct answer but stated indirectly through use of profanity that he did not think he could help himself by talking. Agent Vera again attempted to determine if he wished to waive his rights, and Johnson asked, "if I tell you anything, you're just going to use it against me later, aren't you?" (Trial Tr., Vol. 5 at 203.) Agent Vera responded affirmatively. Johnson then refused to sign any forms but agreed to talk and stated, "you guys have all the evidence against me. I don't need to make any statement. I don't need to say anything." (*Id.* at 205.) Faced with mixed signals, Agent Vera did not question Johnson about the crime but explained, "you have this opportunity to talk to me without a lawyer, to make a statement. You're the only person who can tell me about activities on January 28th of 1993." (*Id.*) Johnson then responded in more certain terms, "I know I'm going to jail for a long time, the rest of my life, I can't help myself by talking to you." (*Id.*) Johnson said nothing further, and questioning ceased.

Johnson's initial indirect and ambiguous statements fall far short of a clear or unequivocal expression of the right to remain silent. *See Thompson*, 866 F.2d at 272 (ambiguous, equivocal, or dubious assertions of desire to remain silent are not enough). Moreover, Johnson's statements to Agent Vera were not made in response to any questioning about the crime but in response to Agent Vera's attempts to determine whether Johnson wished to waive his rights. Our review of the record convinces us that Agent Vera acted prudently by attempting to clarify whether Johnson was asserting his right to silence and by not further questioning him after it was clear that Johnson did not want to talk. *Davis v. United States*, —— U.S. ——, ——, 114 S.Ct. 2350, 2356, 129 L.Ed.2d 362 (1994) (it is often good police practice to attempt to clarify whether or not the suspect is actually invoking his rights). Following the standards stated above, we conclude that the district court did not err in denying Johnson's motion to suppress the statements he made while in custody.

### D. Interstate Commerce Element.

■ Johnson contends that the district court erred by not granting his motion for judgment of acquittal on the carjacking count related to Mr. Crutcher's car because the government failed to prove that the car had moved in interstate commerce, a necessary element of the crime. We review the denial of a motion for judgment of acquittal based upon sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict. *United States v. Deitz*, 991 F.2d 443, 446 (8th Cir.1993). "We will reverse only if a reasonable jury must have had reasonable doubt as to the existence of any element of the charged offense." *Id.*

■ To convict a defendant of carjacking pursuant to 18 U.S.C.A. § 2119,[2] "the government must prove that: 'the defendant (1) while possessing a firearm,[3] (2) took from the person or presence of another (3) by force and violence or intimidation (4) a motor vehicle which had moved in interstate or foreign commerce.'" *United States v. Harris*, 25 F.3d 1275, 1279 (5th Cir.1994) (quoting *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir.1994)). The federal jurisdictional element is that the "motor vehicle" taken during the armed incident must have been "transported, shipped, or received in interstate or foreign commerce." 18 U.S.C.A. § 2119. This language requires nothing more than a showing that the car, at some time, has been in interstate commerce. *See United States v. Johnson*, 22 F.3d 106, 108–09 (6th Cir.1994) (citing *Barrett v. United States*, 423 U.S. 212, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976), and *Scarborough v. United States*, 431 U.S. 563, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977)).

■ Johnson contends that the evidence at trial was insufficient to establish that Mr. Crutcher's car had ever been in interstate commerce because the car was assembled in Kansas City, Missouri, and there was no testimony to demonstrate that Mr. Crutcher had ever driven the car outside the state of Missouri prior to January 18, 1993, the date of the carjacking. The government contends that the interstate commerce element is satisfied because approximately 95% of the parts used to assemble Mr. Crutcher's car were manufactured elsewhere and transported in interstate commerce prior to being assembled into this car. The government presented testimony that none of the major components were manufactured in Missouri. We must determine whether the federal jurisdictional element of the carjacking statute is satisfied when the automobile's parts traveled in interstate commerce prior to assembly but the completed automobile itself has not traveled in interstate commerce.

■ To determine the scope of a statute, we look first to its plain language. *United States v. Talley*, 16 F.3d 972, 975 (8th Cir. 1994). "We 'must give effect to the unambiguously expressed intent of Congress.'" *United States ex rel. Harlan v. Bacon*, 21 F.3d 209, 210 (8th Cir.1994) (quoting *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)). The relevant plain language of section 2119 states that the "motor vehicle" must have been "transported, shipped, or received in interstate commerce." 18 U.S.C.A. § 2119. Neither the statute nor the chapter provides a specific definition for the term "motor vehicle" as used in this section. Therefore, we look to its ordinary, commonsense meaning, "and it is appropriate to assume that the ordinary meaning of those

---

**2.** Whoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall—

(1) be fined under this title or imprisoned not more than 15 years, or both,

(2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and

(3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

18 U.S.C.A. § 2119 (West Supp.1993).

**3.** In September 1994, this element of the statute was substituted with "the intent to cause death or serious bodily harm." 18 U.S.C.A. § 2119 (West Supp.1995). Johnson was convicted under the earlier version.

words accurately expresses the legislative purpose." *United States v. Jones,* 811 F.2d 444, 447 (8th Cir.1987).

In our view, the term "motor vehicle" means a *completely assembled* automotive vehicle of some sort. To be sure, an unassembled pile of all the parts necessary to build a motor vehicle would not, in our usual sense of the word, be referred to as a "motor vehicle." A "motor vehicle" comes into being and exists in fact only when all of the necessary parts have been put together to create the vehicle, i.e., when it rolls off the assembly line. Thus, to reach a conclusion that a pile of motor vehicle parts not yet assembled together is a "motor vehicle" within the meaning of the statute would in essence require us to add to the unambiguous language of the statute.

Practically speaking, to interpret the carjacking statute to include situations where the motor vehicle's component parts had moved in interstate commerce prior to assembly would require no great leap in logic and likely would not offend the Commerce Clause of the Constitution. The plain language of the carjacking statute, however, indicates to us that Congress chose not to reach so broadly. "[I]t is axiomatic that Congress need not legislate to the full extent of its constitutional authority whenever it enacts a statute." *United States v. Watson,* 815 F.Supp. 827, 834 (E.D.Pa.1993). We decline to embellish the plain language of the statute by adding component motor vehicle parts within the definition of a "motor vehicle." [4] "[I]t is not our function to engraft on a statute additions which we think the legislature logically might or should have made." *United States v. Cooper Corp.,* 312 U.S. 600, 605, 61 S.Ct. 742, 744, 85 L.Ed. 1071 (1941).

Our conclusion is further supported by the legislative history surrounding the enactment of this statute. When Congress created the carjacking statute, it also added and amended other provisions that expressly refer to both motor vehicles and motor vehicle parts. *See, e.g.,* 18 U.S.C.A. § 2321 (criminalizing the trafficking of certain "motor vehicles or motor vehicle parts" when the identification number has been removed or altered); 18 U.S.C.A. § 2322 (criminalizing the operations of a "chop shop," specifically defined as a place where persons engage in concealing and dismantling any stolen "passenger motor vehicle or passenger motor vehicle part"). Congress specifically acknowledged a distinction between a motor vehicle and motor vehicle parts in these statutes. Thus, had Congress intended to include motor vehicle parts which had moved in interstate commerce prior or to assembly within the meaning of the term "motor vehicle" in the carjacking statute, we believe that it would have expressly specified this intent as it did in the other statutes, but it did not.

We conclude that Congress chose to limit the carjacking statute to circumstances where a fully assembled "motor vehicle" has been transported in interstate commerce rather than including circumstances where either the motor vehicle or the motor vehicle's *parts,* prior to assembly, moved in interstate commerce. In this case, there was evidence that the parts had moved in interstate commerce prior to assembly, but there was no evidence whatever that the completed motor vehicle had ever moved in interstate commerce. Therefore, the district court erred in not granting Johnson's motion for judgment of acquittal on this count, and we remand for resentencing.[5]

### E. Double Jeopardy.

Johnson contends that the district court erred in denying his motion to dismiss the gun counts, *see* 18 U.S.C.A. § 924(c)(1),

---

**4.** The government cites no cases discussing the issue of whether parts constitute a "motor vehicle" within the meaning of § 2119. We note that the argument has been rejected in dicta by the Eastern District of Pennsylvania. *See Watson,* 815 F.Supp. at 832 n. 12. We agree with the *Watson* court's observation that shipment of a motor vehicle is not the same as shipment of a part and that to interpret the statute so broadly could cause results not intended by Congress.

**5.** The carjacking count related to Mr. Crutcher's vehicle is Count V. The gun count related to the carjacking of Mr. Crutcher's car is Count VI. Because Count VI is premised upon a conviction under Count V, the district court must grant a judgment of acquittal on both counts and resentence Johnson accordingly.

arguing that they constitute multiple punishments for the same offense as the carjacking counts, in violation of the Double Jeopardy Clause. We disagree.

We have recently rejected this argument in *United States v. Jones,* 34 F.3d 596, 601 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1701, 131 L.Ed.2d 563 (1995). We held that "[t]he language of § 924(c)(1) shows that Congress intended to impose multiple punishments for the use or carrying of a firearm during and in relation to 'any' crime of violence"—including carjacking. Thus, we find it unnecessary to further discuss the issue.

### F. Upward Departure.

■ At sentencing, the district court sustained the government's motion for an upward departure from the sentencing guidelines range on two grounds—extreme psychological or emotional injury and extreme conduct. *See* U.S.S.G. §§ 5K2.3, 5K2.8. Johnson contends that the district court erred because there was no evidence that the psychological injury was more serious than that normally resulting from this offense, as required by U.S.S.G. § 5K2.3, and because the upward departure was not reasonable since his sentence before departure amounts to a life sentence.

■ Section 5K2.3 provides that a district court may impose an upward departure for extraordinary psychological injury that is "much more serious than that normally resulting from commission of the offense." U.S.S.G. § 5K2.3. Section 5K2.8 provides that a district court may impose an upward departure "[i]f the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim," including such acts as "torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation." U.S.S.G. § 5K2.8. *See United States v. Fire Thunder,* 908 F.2d 272, 275 (8th Cir.1990). We can sustain the district court's upward departure from the sentencing guidelines range as long as the departure is warranted pursuant to *either* section 5K2.3 or section 5K2.8. *See Fire Thunder,* 908 F.2d at 275.

Because we find that Johnson's conduct clearly warranted a departure pursuant to section 5K2.8, we need not discuss Johnson's arguments related to section 5K2.3. The district court found that Johnson's conduct toward Miss Kientzy was unusually heinous, cruel and brutal, amounting to torture and gratuitous infliction of injury. Johnson bound Miss Kientzy and subjected her to a course of extremely cruel and degrading physical, sexual, and verbal abuse, including acts and words by which he deliberately put her in constant fear of her life. We find ample support in the record for the district court's findings, and we conclude that the district court did not err by granting an upward departure on the basis of section 5K2.8.

■ We review the reasonableness of the extent of an upward departure for an abuse of discretion. *See United States v. Perkins,* 929 F.2d 436, 438 (8th Cir.1991). The district court's decision on this matter "is 'quintessentially a judgment call' and we respect the district court's superior 'feel' for the case." *Id.* (quoting *United States v. Snover,* 900 F.2d 1207, 1211 (8th Cir.1990)). *See also United States v. Sweet,* 985 F.2d 443, 445 & n. 2 (8th Cir.1993).

■ The district court effected an upward departure by requiring that the term of imprisonment on the carjacking count related to Miss Kientzy (293 months) be served consecutively to the terms of imprisonment ordered for the other carjacking counts (180 months), when these terms would otherwise have run concurrently with one another. The departure thus effectively added 180 months of imprisonment to Johnson's sentence. Together with the mandatory consecutive 65–year total term of imprisonment for the four gun counts, Johnson's final sentence totalled 1,253 months of imprisonment. We conclude that the district court's departure decision is reasonable even though it surpasses what is effectively a life sentence for Johnson. Given the extremely heinous nature of Johnson's conduct with Miss Kientzy, we cannot find that the district court abused its discretion by ordering a consecutive term of imprisonment for the punishment imposed for that count.

### III.  Conclusion.

We reverse the judgment of the district court on count V and count VI because the government did not satisfy the interstate commerce element of the carjacking statute on count V, and we remand for resentencing consistent with this opinion.  We affirm the judgment of the district court in all other respects.