**UNITED STATES of America, Plaintiff,**

v.

**Carlos Undry HICKS, Defendant.**

**No. 96–CR–80335–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

May 27, 1997.

Robert W. Haviland, Assistant U.S. Attorney, Flint, MI, for Plaintiff.

Cornelius Pitts, Detroit, MI, for Defendant.

**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS STATEMENTS AND IDENTIFICATION AND DISMISSING DEFENDANT'S MOTIONS FOR DISCOVERY, *BRADY* DISCLOSURE, AND FOR AGENTS TO RETAIN ROUGH *NOTES AS MOOT***

ROSEN, District Judge.

### I. *INTRODUCTION*

In the November 6, 1996 Superseding Indictment in this case, Defendant Carlos Un-

dry Hicks is charged with: (1) Distributing crack cocaine in violation of 21 U.S.C. § 841(a) on November 8, 1995; (2) Distributing crack cocaine in violation of 21 U.S.C. § 841(a) on November 16, 1995; (3) Distributing and Aiding and Abetting Distribution of crack cocaine on February 14, 1996; and (4) Murdering Daniel Duffie, a federal witness who testified against Defendant during grand jury proceedings, in violation of 18 U.S.C. § 1512(a), on October 10, 1996.

This matter is before the Court on several pre-trial motions filed by Defendant on January 29, 1997, including: (1) Motion to Suppress Statements; (2) *Motion to Suppress Identification*; (3) Motion for Discovery and *Brady* Disclosure; and (4) Motion for Government Agents and Law Enforcement Officers to Retain Rough Notes. Having reviewed the parties' briefs and conducted a hearing on this matter, including taking testimony, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. FACTUAL BACKGROUND

### A. The Statement Prior to Arrest.

After the Flint police were notified of the shooting of Daniel Duffie[1], the police received information that the shooter was wearing a black ¾ length leather jacket and a pull-over and that some individuals involved in the shooting had entered a residence located at 121 E. Russell. Thus, several officers from the Flint Police Department went to 121 E. Russell. According to Officer Smith, one of the responding officers, he and the other officers cautiously approached the residence with their weapons drawn. Upon knocking at the door, the officers were admitted into the residence by a woman who they presumed was the owner. Next, the officers proceeded through the doorway with their weapons drawn and then into the immediately adjacent living room where they observed 5 people. After determining that the scene was not volatile, the officers returned their weapons to their holsters[2] and patted

down the 5 people to ensure that they were not armed. In his testimony, Officer Smith stated that, at this time, no one was free to leave. Subsequently, Officer Smith observed a black leather jacket and a green pull-over hung over the back of the chair in which Defendant was sitting. Upon seeing the jacket and the pull-over, Officer Smith picked the items up, and referring to the items, asked generally to the 5 people in the room: "Whose is this?" Defendant responded that the items were his. Thereafter, Defendant was arrested, handcuffed, and taken to the Criminal Investigations Bureau of the Flint Police Department.

### B. The Identification at the Police Department.

Upon arriving at the Police Department, two officers escorted Defendant to the second floor. Upon entering a hallway on the second floor, a man who was seated at the opposite end of the hallway spontaneously identified Defendant as the shooter of Daniel Duffie. This man had been an eyewitness to the shooting an hour earlier, although he did not know that the officers had indeed arrested Defendant for this crime.

At the time the man identified Defendant, Defendant was handcuffed and one of the escorting officers was in front of Defendant and the other was behind him. As soon as the officers heard the man identify Defendant, they immediately placed Defendant in a room off the hallway and closed the door. The officers did not know that the eyewitness would be in the hallway and they were not aware of his relationship to the shooting until after he identified Defendant.

### C. The Eyewitness' Testimony.

At the hearing on these pending motions, the eyewitness explained how he came to identify Defendant at the Police Department. Specifically, he testified that late in the evening on October 10, 1996 he was driving his car near Grant's Market at the intersection

---

1. At this time, the Flint police were not aware that Daniel Duffie was a witness who had testified against Defendant during federal grand jury proceedings.

2. One of the responding officers, Sgt. Warren, had a shotgun which he placed at his side.

of Ruth and M.L. King, Jr. in Flint, MI. At this time, he observed the shooter, who was carrying a gun, run towards another car that was approximately 15 feet away on the other side of the intersection. Because the area was well-lighted by street lights, the eyewitness got a clear look at the shooter which was firmly impressed in his mind due to these troubling circumstances. Thereafter, the eyewitness observed the shooter approach the driver's side front door of the car and fire several shots at the driver. Then, the eyewitness drove into the Grant's Market parking lot and watched the shooter fire more shots before the shooter fled the scene.

Next, the eyewitness approached the car of the victim and determined that he had been fatally shot. As the eyewitness was attempting to contact law enforcement authorities at a nearby residence, the police arrived at the scene. Subsequently, the eyewitness went to the Flint Police Department for questioning. While he was in a hallway at the Police Department waiting to talk with the police, other officers brought Defendant down the hallway at the opposite end, whereupon the eyewitness spontaneously identified Defendant as the shooter. At the hearing, the eyewitness indicated that less than an hour had elapsed between the crime and this identification.

### D. The Statements After the Miranda Rights.

At some point after the identification, Sgt. Warren of the Flint Police Department advised Defendant of his *Miranda* rights. After being so advised, Defendant allegedly replied that he did not feel like he should say anything because he had been indicted. Being unaware of what indictment Defendant was talking about [3] since Defendant had not yet been charged with the shooting, Sgt. Warren continued to interview Defendant. During this interview, Defendant admitted that he had been at Grant's Market that evening, even though initially he had denied this. Thereafter, Defendant specifically refused to answer any more questions.

3. The Flint Police Department were unaware at this time that a federal grand jury had indicted

## III. ANALYSIS

### A. The Statements Regarding the Jackets.

In his Motion to Suppress, Defendant argues that his admission to Officer Smith that he owned the black leather jacket and the green pull-over should be suppressed since this admission was the product of custodial interrogation. The Government, however, contends that Defendant was not in custody and therefore, that Defendant's statement regarding the jacket and the pull-over should not be suppressed.

It is well-established that a suspect cannot be subjected to custodial interrogation until he has been advised of his rights consistent with the Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). Thus, any statements that a suspect makes while he is in custody and is being interrogated cannot be admitted at trial unless the suspect was first advised of his *Miranda* rights. Accordingly, the Court must first determine if Defendant was in custody, and then, if necessary, determine if he was interrogated.

### 1. The Supreme Court Cases.

The starting point for determining whether or not Defendant was in custody is *Miranda* itself. Here, the Supreme Court stated that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612.

In two subsequent cases, the Court held that suspects were not in custody for *Miranda* purposes even though they were invited or voluntarily escorted to the police station; told that they were not under arrest; and then subsequently subjected to questioning which elicited incriminating statements. *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77

Defendant on drug trafficking charges, based in part on the testimony of Daniel Duffie.

L.Ed.2d 1275 (1983). These two cases, read together, stand for the following proposition: "[T]he ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Beheler,* 463 U.S. at 1125, 103 S.Ct. at 3520 (citing *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714). Moreover, *Miranda* warnings are not triggered merely because an individual who is being questioned by law enforcement officers is a suspect or is the focus of criminal investigation. *Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. Finally, courts should inquire "how a reasonable [person] in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).

### 2. *The Courts of Appeals Cases.*

In applying this Supreme Court precedent, the Courts of Appeals have relied on a totality of circumstances approach to determine whether an objectively reasonable person in the defendant's position would have concluded that he was not free to leave or to ask the police to leave the place where the questioning was occurring. *United States v. Griffin,* 922 F.2d 1343, 1348–49 (8th Cir.1990); *United States v. Booth,* 669 F.2d 1231, 1235 (9th Cir.1981); *United States v. Jones,* 933 F.2d 807, 810 (10th Cir.1991); *United States v. Phillip,* 948 F.2d 241, 247 (6th Cir.1991); *United States v. Howard,* 991 F.2d 195, 200 (5th Cir.), *cert. denied,* 510 U.S. 949, 114 S.Ct. 395, 126 L.Ed.2d 343 (1993); *United States v. Hocking,* 860 F.2d 769, 773 (7th Cir.1988).

In applying this approach, several Courts of Appeals have found that when police question a suspect in a residence, these circumstances often do not rise to the kind of custodial situation that necessitates *Miranda* warnings. *Howard,* 991 F.2d at 200 (no custody when questioning occurred at defendant's home and he was told he was not under arrest, although told to "stay put"); *U.S. v. Wolak,* 923 F.2d 1193, 1196 (6th Cir.) (see discussion, *infra*), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2824, 115 L.Ed.2d 995 (1991); *U.S. v. Gregory,* 891 F.2d 732, 735 (9th Cir. 1989) (no custody when suspect consented to brief interview in home with wife present, and agents returned guns to their holsters); *Krantz v. Briggs,* 983 F.2d 961, 962 (9th Cir.1993) (*Miranda* warnings not required when officers went to suspect's girlfriend's home, and suspect voluntarily invited them inside and agreed to talk); *Devier v. Zant,* 3 F.3d 1445, 1458 (11th Cir.1993) (*Miranda* warnings not required when defendant questioned at home without *Miranda* warnings and then volunteered to continue questioning at station), *cert. denied,* 513 U.S. 1161, 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995).

In these cases, the factors that the Courts relied on include: (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as (a) whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; (b) whether the suspect possessed unrestrained freedom of movement during questioning; and (c) whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

In particular, these factors were implicit in the Sixth Circuit's decision in *Wolak, supra,* 923 F.2d 1193. Here, two police officers responded to a "disturbance" call at a party store. When they arrived, without knowing what had occurred, the officers asked the defendant what had happened. The defendant responded that he feared that the victim was going to assault him, so he had pulled a gun. In finding that this statement was not subject to suppression, the Court stated that:

> It is probably true, as [the defendant] suggests, that at the time he made the statement to Schamanski, he was not free to leave because the officers were not letting anyone leave until they found out what was going on. We do not see this as the type of "custody" envisioned by *Miranda.* [Defendant's] premise, carried to its logical conclusion, would require officers to announce *Miranda* warnings to everyone present immediately upon arriving at a possible crime scene before they knew

what happened or before they could ask any questions. [Defendant] was not the specific focus of an investigation nor was there anything different from any other police-citizen investigative encounter.

*Wolak*, 923 F.2d at 1196. Indeed, as the Sixth Circuit noted, this reasoning mirrored the Supreme Court's language in *Mathiason*, *supra*, where the Court stated:

Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. . . .

429 U.S. at 495, 97 S.Ct. at 714.

The Ninth Circuit's decision in *Gregory*, *supra*, 891 F.2d 732, is also instructive. Here, in affirming the District Court's denial of the defendant's motion to suppress, the Court stated the following:

The district court concluded that Gregory was not in custody because he consented to be interviewed in his house, he was interviewed in the presence of his wife, the interview lasted only a brief time, and no coercion or force was used. Although the agents initially drew their guns, they returned them to their holsters prior to the interview. They stated that they wanted to question Gregory about some robberies committed in Phoenix and they made no suggestion that Gregory would not be free to leave. The entire interview lasted only a few minutes.

*Gregory*, 891 F.2d at 735.

█ In the instant matter, after the officers had been consensually admitted into the residence, briefly patted the people down [4], and returned their weapons to their holsters/sides, Officer Smith asked a general question addressed to the 5 people in the room at the private residence. Moreover, although the officers may have subjectively felt that no one in the house was free to leave, the officers never communicated this to Defendant or the 4 other people present. Finally, the officers' interaction with Defendant and the others prior to Defendant's admitting ownership of the jacket and the pull-over was only several minutes in duration. Therefore, the Court finds that the totality of these circumstances do not suggest that Defendant was in custody, particularly because, as the Sixth Circuit has observed, "officers [are not required] to announce *Miranda* warnings to everyone present immediately upon arriving at a possible crime scene before they kn[ow] what happened or before they [can] ask any questions." *Wolak*, 923 F.2d at 1196.[5] Accordingly, the Court will deny Defendant's Motion to Suppress his statement regarding the black leather jacket and the green pull-over.

## B. The Identification at the Police Department.

While Defendant was handcuffed and being led down a hallway at the Flint Police Department by two officers, an eyewitness to the murder of Daniel Duffie spontaneously identified Defendant as the shooter. Defendant has moved the Court to suppress this identification and any subsequent in court identification of Defendant by this eyewitness as unreliable due to the suggestive circumstances of the initial identification in the

---

4. It is undisputed that the officers action here is permissible under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny.

5. Having found that Defendant was not in custody, it is not necessary for the Court to determine whether Officer Smith's general question to the room of people was interrogation of Defendant for *Miranda* purposes. However, because the question was addressed to all five people in the room generally, was open-ended, and not in the least coercive in nature, it is not clear that the question would have triggered the *Miranda* protections. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980) ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police").

hallway. The Government opposes this Motion, contending that the initial identification is reliable, as would be any subsequent in court identification. Thus, the Court will first address the reliability and admissibility of the initial identification at the Flint Police Department, and then in light of that determination, evaluate the reliability and admissibility of an in court identification by this witness.

The Due Process Clause prohibits the use at trial of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Manson v. Brathwaite,* 432 U.S. 98, 117, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977). Thus, "reliability is the linchpin in determining the admissibility of identification testimony . . . ." *Id.* at 114, 97 S.Ct. at 2253. In particular, "[t]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." *Id.* at 106, 97 S.Ct. at 2249. Accordingly,

> "a court is obligated to review every pretrial encounter, accidental or otherwise, in order to insure that the circumstances of the particular encounter have not been so suggestive as to undermine the reliability of the witness' subsequent identification."

*Thigpen v. Cory,* 804 F.2d 893, 895 (6th Cir.1986) (quoting *Green v. Loggins,* 614 F.2d 219, 223 (9th Cir.1980)). Then, if the identification procedure itself is unduly suggestive, "the 'central question' [becomes] whether under the totality of the circumstances the identification was . . . reliable." *Thigpen,* 804 F.2d at 896 (quoting and citing *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)).

In this case, the Court finds that the procedure itself is not suggestive because of the unprovoked spontaneity of the identification and the lack of a suggestive context, from the perspective of the eyewitness, as to why the Defendant was handcuffed and at the police station. Specifically, the police did not intend for this identification to occur and they were not aware that it was likely to

happen. Just as importantly, the eyewitness was not told, and did not know at the time of his identification of the Defendant, that the police were bringing in someone to discuss the same case that he was at the police station for, and it is not unusual to see someone in handcuffs at a police station. In this context, the identification here is clearly different from a show-up or a line-up in that the eyewitness was not informed prior to the identification that the Defendant was a suspect or had been arrested for the murder.

The Court's finding of a lack of suggestiveness is further supported by the Sixth Circuit's decision in *Mock v. Rose,* 472 F.2d 619 (6th Cir.), *cert. denied,* 411 U.S. 971, 93 S.Ct. 2165, 36 L.Ed.2d 693 (1973), a case presenting even more suggestive surrounding circumstances. Unlike the instant case, in *Mock,* a victim of a robbery was told that the police had arrested someone in connection with her robbery and that she should go to police headquarters. The victim was sitting in a room at the headquarters when an officer was taking the suspect from a holding cell to another part of the building to be questioned by a detective. In so doing, the officer and the suspect were inadvertently observed by the victim. Upon seeing the suspect, the victim identified the suspect and shouted "'that's him, that's him.'" *Id.* at 621. In finding that this identification was not subject to suppression, the Court stated:

> [T]he [suspect] was not brought into view of [the victim] for a possible identification. The confrontation was accidental and unplanned and the identification . . . was spontaneous. There was no suggestion of any kind, actual or implied, made by the police to [the victim] that the [suspect] was arrested [for the crime against her] . . . We conclude that under the totality of the circumstances of this case there was no prejudice . . . by the pre-trial identification. . . .

*Mock,* 472 F.2d at 621.

Even if the Court were to find that the identification procedure itself was suggestive, the Court finds that the identification was reliable. In determining the relia-

bility of a pre-trial identification, a court should examine

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil,* 409 U.S. at 199–200, 93 S.Ct. at 382–83.

■ Applying these factors to the instant matter, the Court concludes that the eyewitness' identification of Defendant while he was handcuffed in the hallway at the Flint Police Department is reliable and not subject to suppression. First, the man who identified Defendant was an eyewitness to the crime. Specifically, he had the opportunity to see the shooter clearly as the shooter ran past his car at a distance of a few feet and then, at a distance of 15 feet, he watched the shooter commit the murder—observing all of this in a well-lighted area. Second, the eyewitness observed the shooter run past his car and commit the murder with a high degree of attention due to the compelling circumstances of a man with a gun running by him and then shooting another. Third, there is nothing in the record with respect to any description of the shooter that the eyewitness may have given prior to the identification at issue. Fourth, the eyewitness, with great certainty and conviction, immediately and spontaneously identified Defendant as the shooter upon seeing him at the Police Department, without the police suggesting to the identifying witness that the Defendant had anything to do with the crime about which the witness was to be questioned. Finally, the identification occurred within an hour of the crime.

The reliability of this identification is also suggested by the *Mock* decision where the Sixth Circuit found, in circumstances highly analogous to the instant matter, that an eyewitness' identification of a defendant in a police station shortly after he robbed her was sufficiently reliable to survive suppression. *Mock,* 472 F.2d at 621. Therefore, in light of *Mock* and the *Neil* factors, the Court finds that the circumstances of the instant identifi-

cation at the Police Department provide sufficient indicia of reliability to convince the Court that the identification should not be suppressed. Having so found, the Court also concludes that any subsequent in court identification should not be suppressed on these grounds. *See, United States v. Hill,* 967 F.2d 226, 232 (6th Cir.1992).

### C. *Defendant's Statements after the Miranda Warnings Were Administered.*

After Sgt. Warren advised Defendant of his *Miranda* rights, Defendant replied that he did not feel like he should say anything because he had been indicted. Not knowing of any indictment, Sgt. Warren continued with the interview at which time Defendant initially denied, and then admitted, that he had been at Grant's Market that evening. Thereafter, Defendant refused to answer any more questions. Now, Defendant seeks to suppress all the statements that he made after Sgt. Warren administered the *Miranda* rights, contending that when he stated that he did not feel like he should say anything he effectively invoked his *Miranda* right to remain silent. The Government opposes this Motion, arguing that Defendant's statement about being indicted does not constitute the unequivocal invocation of the right to remain silent that is necessary to halt an interview after *Miranda* rights have been administered.

■ The Fifth Amendment privilege against self-incrimination is safeguarded after arrest by *Miranda* warnings. Thus, after an officer gives *Miranda* warnings to a suspect in custody, if the suspect indicates that he wishes to remain silent, the officer must cease any interrogation. *Michigan v. Mosley,* 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). "To adequately invoke this right and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'" *United States v. Johnson,* 56 F.3d 947, 955 (8th Cir.1995); *See also, Medina v. Singletary,* 59 F.3d 1095, 1100 (11th Cir. 1995) ("Law enforcement officers are not required to terminate an interrogation unless the invocation of the right to remain silent is unambiguous"); *United States v. Banks,*

78 F.3d 1190, 1197 (7th Cir.1996) (same); *Davis v. United States,* 512 U.S. 452, 456–62, 114 S.Ct. 2350, 2354–56, 129 L.Ed.2d 362 (1994) (with regard to the right to counsel under *Miranda,* questioning need not cease after a defendant makes an ambiguous or equivocal reference to an attorney).

The Eighth Circuit applied this rule of unequivocal invocation in *Johnson.* Here, after the officers read the suspect his *Miranda* warnings, he stated that he did not think that talking to the police would help him since the police had all the evidence, and therefore, he also stated that he did not need to say anything. In affirming the District Court's denial of the defendant's motion to suppress these statements and other incriminating statements that followed, the Eighth Circuit concluded that the defendant's statements were indirect, ambiguous, and equivocal. Thus, the Court held that they did not constitute an invocation of his right to remain silent.

■ In light of *Johnson* and the other Courts of Appeals decisions that have interpreted *Davis, supra,* 512 U.S. 452, 114 S.Ct. 2350, in the right to remain silent context, the Court finds that Defendant's statement that he did not feel that he should say anything because he had been indicted is not the clear and unequivocal assertion of the right to remain silent that requires the police to cease questioning. First, because Defendant was referring to an indictment in a different case about which the interviewing officer had no knowledge, his statement that he did not think he should say anything because he had been indicted is an ambiguous and equivocal statement. Quite naturally, Sgt. Warren assumed that the indictment to which Defendant was referring related to the Duffie shooting, something that Sgt. Warren knew was not possible since Defendant had not yet been charged. Second, as became clear subsequently, when Defendant wanted to unequivocally invoke his right to remain silent, he knew how to do it and he did it. Therefore, Defendant's Motion to Suppress here will be denied.

**D. *Other Pending Motions.***

At the hearing on this matter the Court also entertained the remainder of Defendant's pre-trial motions, including Motions for Discovery, *Brady* Disclosure, and for Government Agents to Retain Rough Notes. Defendant's counsel indicated that at this time he was satisfied that the Government was complying with all of its obligations related to these Motions. Therefore, for the reasons stated on the record, the Court will dismiss Defendant's Motions for Discovery, *Brady* Disclosure, and for Government Agents to Retain Rough Notes as moot.

## IV. CONCLUSION

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion to Suppress Statements and Motion to Suppress Identification are DENIED;

IT IS FURTHER ORDERED that Defendant's Motion for Discovery, Motion for *Brady* Disclosure, and Motion for Government Agents to Retain Rough Notes are DISMISSED AS MOOT.