**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**Erika ARROYA, Defendant–Appellee.**

**No. 99SA153.**

Supreme Court of Colorado,
En Banc.

Nov. 29, 1999.

As Modified Nov. 30, 1999.

A. William Ritter, Jr., District Attorney, Second Judicial District Nathan B. Coats, Chief Deputy District Attorney Denver, Colorado Attorneys for Plaintiff–Appellant.

David F. Vela, Colorado State Public Defender Anthony Viorst, Deputy State Public Defender. Denver, Colorado Attorneys for Defendant–Appellee.

Justice BENDER delivered the Opinion of the Court.

## I. INTRODUCTION

In this interlocutory appeal pursuant to C.A.R. 4.1 and section 16–12–102(2), 6 C.R.S. (1999), the People challenge the trial court's order suppressing a custodial statement made by the defendant, Erika Arroya, concerning the death of her three-year old son. The trial court suppressed certain portions of Arroya's custodial statements on the grounds that Arroya asserted her right to remain silent and thereafter the police did not "scrupulously honor" this assertion, thereby violating her rights under the Fifth and Fourteenth Amendments.

We hold that before the obligation of police to respect fully a suspect's right to remain silent is triggered, a suspect, who is in custody and being questioned, must clearly articulate the right to remain silent. This must be done in such a manner that a reasonable

police officer under the circumstances would understand the suspect's conduct and words to mean that she is asserting her right under *Miranda* to cut off questioning. Although the trial court failed to articulate the precise legal standard we adopt in this opinion, we hold that the court considered the appropriate factors to determine whether Arroya invoked her right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Here, the trial court addressed the totality of the circumstances surrounding Arroya's statement and found that she unambiguously asserted her right to remain silent. Once Arroya unequivocally asserted this right, the police had a duty to honor scrupulously her right to remain silent. Because the police took no steps that would allow them to resume questioning once Arroya clearly invoked her right to remain silent, we affirm the trial court's ruling that the police failed to "honor scrupulously" Arroya's assertion of her right under *Miranda* to cut off custodial questioning. Thus, we affirm and return this case for further proceedings.

## II. BACKGROUND FACTS

On the afternoon of the interrogation, Erika Arroya called 911 from a pay phone at a 7–11 store to report that her son had drowned. Emergency personnel responded and found Arroya at the store with her son, Armando, age three. Paramedics took Armando to the hospital where medical personnel pronounced him dead. Police officers first interviewed Arroya at the scene, and then accompanied her to the apartment where Armando allegedly drowned. They later took Arroya to the police station for further questioning.

At the police station, Detective David Neil interrogated Arroya over the course of several interviews. Before initiating questioning, the detective advised Arroya of her rights under *Miranda* to request counsel and to remain silent, and Arroya signed the written form that the detective used to describe these rights to her. The detective also obtained Arroya's consent to record the interrogation on video and audiotape, and she signed a written form giving consent. Once the video recording began, the detective re-

advised Arroya of her rights as she followed along on the standard form.

The first interview began at 4:40 p.m. and lasted until 5:49 p.m. During this first interview, Arroya denied that she had harmed her son, insisting that she left him alone in the bathtub and returned shortly thereafter to find that he had drowned.

After the first interview ended, police continued their investigation and Detective Neil began a second interview slightly more than two hours later. The detective did not restate the *Miranda* warnings to Arroya before beginning this second interview. This interrogation was recorded on both video and audiotape, and the detective continued his questioning about the circumstances surrounding the death of Arroya's son.

During this interview, Arroya made several incriminatory statements and the detective asked her if she would like a break. Arroya stated, "I don't wanna talk no more." The detective momentarily stopped questioning Arroya at that time because, as he testified, he thought Arroya meant that she wanted a break, not that she wanted to stop the interrogation altogether. Arroya remained in the interview room during the break, which lasted some number of minutes. After this short break, the detective resumed questioning and Arroya made further incriminating statements about the death of her son. At no point during either the first or the second interview did Arroya request an attorney.

## III. TRIAL COURT'S FINDINGS AND ANALYSIS

The People charged Arroya with two counts of first-degree murder under sections 18–3–102(1)(a) and (f), 6 C.R.S. (1998). Arroya moved to suppress all statements made in the second interview after the break, asserting that her words, "I don't wanna talk no more," invoked her right to remain silent and thereby cut off questioning, and that the police failed to respect fully her exercise of this right as required by both the U.S. Supreme Court in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and this court in *People v. Quezada*, 731 P.2d 730 (1987).

In a six-page written opinion adopting the portions of Arroya's argument relevant to this appeal, the trial court stated that it reviewed the transcripts and videotapes of the interrogation in their entirety. Earlier during the hearing on the motion to suppress, the judge expressly stated that he would personally review the videotapes of the interrogation in order to appreciate fully the demeanor and tones of the detective and Arroya, as opposed to just viewing their words in the transcripts. With respect to the general circumstances of the questioning, the trial court found that Arroya had little or no contact with the criminal justice system before this interrogation. The court credited the detective with maintaining a "gentle" tone throughout the interrogation, noting that he was "repeatedly solicitous" of Arroya's condition.[1] The trial court found that there were a number of questions asked by the detective that she did not answer. The court found that Arroya's answers to the detective's questions on the second tape were far less responsive than were her answers on the first videotape; on the second tape her answers were "frequently difficult" to hear. At the hearing on the motion to suppress, the court inquired and was told that only the detective, a district attorney, and Arroya were present during the interview.

Along with these general findings, the trial court made findings concerning the specific facts of the interrogation. The court found that although Arroya gave unintelligible answers or no answers at all to many of the detective's questions on the second tape, her statement "I don't wanna talk no more" was understandable on the tape. The court noted that the initial advisement given at the beginning of the first tape included notice of her right to remain silent, but that the advisement was not given to Arroya at the beginning of the second interview.

Addressing the circumstances preceding Arroya's statement that she did not "wanna talk no more," the trial court found that just before Arroya's request to stop the interrogation, she made a number of serious, incriminating admissions:

Indeed in the second interrogation there are a number of questions asked by Detective Neil to which there is no answer given by Defendant. The answers which are given are frequently difficult to hear. Before she indicated that she did not want to talk any further she made it clear that her boyfriend was not involved[;] ... that [the child] died because of the water[;] ... that he died because she was holding him under water[;] ... that she did it but she wouldn't tell what she did[;] ... that nobody had anything to do with it other than her and there is nobody to blame but her.... Her statement, "I don't wanna talk no more," is understandable on the tape, and was preceded by these serious admissions.

We note that the dialogue that occurred just before Arroya said, "I don't wanna talk no more," appears to support the trial court's finding that Arroya clearly asserted her right to remain silent and to cut off further questioning. The detective asked, "Do you want a break?" after Arroya made serious incriminatory statements, and Arroya did not answer the question directly but instead said, "I don't wanna talk no more."

> **Arroya:** (Long pause) Aah. (Unintelligible) (crying) I don't wanna think of it (sic). I'm all messed up. I don't know ... I just ... I ... I know I put him to sleep with ... I've done some things that I know they are for the best, but he had a life. He felt. He was not like an abortion, he was ... (crying & sighing) ...
>
> **Neil:** It's not like an abortion ... it was ...
>
> **Arroya:** He is ... he had life.
>
> **Neil:** Yeah.
>
> **Arroya:** He lived in me.
>
> **Neil:** *Do you wanna break?*
>
> **Arroya:** (Crying) *I don't wanna talk no more.*

(Emphasis added.)

Once Arroya said she wanted to stop the questioning, the trial court found that the

---

1. The trial court noted that the detective asked Arroya whether or not she needed a kleenex, something to drink, and even whether she wanted an opportunity to smoke. Additionally, the court found, based its on review of the entire interrogation, that the detective had not used "unscrupulous techniques."

detective immediately stopped and gave her a break. The court could not determine the exact length of the break, but found that it was "relatively short, measured in minutes rather than hours or days."

After the short break, the questioning resumed. The detective made no attempt, the trial court found, to re-advise Arroya of her rights or to clarify her earlier statement that she did not want to talk further. The court found that there "certainly was no subsequent *Miranda* advisement or discussion," but that the questioning continued:

> When the interview was resumed there was no attempt to re-advise defendant or to clarify her previous statement. . . . There was certainly no subsequent *Miranda* advisement or discussion of her rights. Rather, the tape demonstrates that after a short break questioning continued.

Based on its consideration of these circumstances, the trial court held that although Arroya "had voluntarily agreed to speak and had voluntarily spoken with the detective for some period of time, the statement 'I don't wanna talk no more,' was a clear invocation of her right to remain silent." Even though the detective testified that he thought Arroya's statement meant she wanted to take a break and not that she wanted to cut off the questioning entirely, the court concluded that "her statement is an invocation of the right to remain silent and triggers the steps which must be taken in order to reinitiate conversations."

After concluding that Arroya's statement was a clear assertion of her right to remain silent, the trial court then assessed the police conduct surrounding Arroya's unequivocal assertion of her right to cut off questioning. The court found that the police failed to clarify the meaning of Arroya's statement; that the police gave her only a very short break; and that the police did not re-advise Arroya of her rights under *Miranda* when they continued with the questioning. The court concluded that under these circumstances the police had not "scrupulously honored" Arroya's request to cut off questioning. The court reasoned that the police did nothing that would permit them to resume the interrogation once the right had been invoked, consistent with *Mosley,* 423 U.S. at 104–05, 96 S.Ct. 321, and *Quezada,* 731 P.2d at 733, and therefore the police failed to respect fully the assertion of Arroya's right to remain silent.

## IV. STANDARD OF REVIEW

 We begin our analysis with a brief statement of our standard of review of the trial court's ruling. An appellate court must defer to trial court findings of fact, as long as competent evidence in the record supports them. *See People v. Jordan,* 891 P.2d 1010, 1015 (Colo.1995). In cases like this one, where the issue presented to the appellate court is a mixed one of both law and fact, we defer to the factual findings of the court so long as there is sufficient evidence in the record to support the findings, but we subject the trial court's legal conclusions to de novo review. *See People v. Romero,* 953 P.2d 550, 555 (Colo.1998) (deferring to trial court's factual analysis of whether criminal suspect "sufficiently expressed his desire for the assistance of counsel"); *Quezada,* 731 P.2d at 732–33.

## V. "CLEAR ARTICULATION" OF RIGHT TO REMAIN SILENT—LEGAL STANDARD AND SCOPE OF THE INQUIRY

### A. "Clear Articulation" Rule

 We now turn to address what a suspect must say to invoke the right to remain silent in order to require the police to respect fully the exercise of the suspect's right to cut off questioning under *Miranda.* People seldom speak with precise legalistic words, and in a police custodial setting while being questioned, few people would say, "I hereby invoke my right to remain silent and decline to answer any further questions." The words used by a suspect often will be subject to more than one interpretation. Hence, the police and then perhaps a trial court must determine whether a suspect has invoked the right to remain silent and cut off interrogation, requiring that the police engage in conduct that scrupulously honors or fully respects the exercise of this right. Following the standard established for right to counsel cases, we hold that a suspect must clearly

articulate the desire to remain silent so that a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect is asserting her *Miranda* right to cut off questioning, thereby requiring the police to respect fully the suspect's exercise of this right.

Before undergoing a custodial interrogation, a suspect must be advised of her *Miranda* rights, which include the Fifth Amendment rights to have an attorney present and to remain silent in the face of questioning. *See Miranda,* 384 U.S. at 479, 86 S.Ct. 1602. By invoking either the right to counsel or the right to remain silent, a suspect may at any time before or during custodial interrogation cut off the questioning, and if the suspect is willing to proceed with the interrogation, she must specifically waive these rights. *See id.* at 473–74, 479, 86 S.Ct. 1602. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* at 475, 86 S.Ct. 1602.

Once a criminal suspect invokes his right to remain silent, the police must "scrupulously honor" the assertion of this right in order to comply with the *Miranda* doctrine. As the Supreme Court explained in *Mosley,* 423 U.S. at 103–04, 96 S.Ct. 321:

A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means ... to notify the

person of his right of silence and to assure that the exercise of the right will be scrupulously honored...." The critical safeguard ... is a person's "right to cut off questioning." Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

(Citations omitted.) The requirement that the police scrupulously honor a suspect's exercise of the right to remain silent does not mean that the police must cease all questioning until the suspect's attorney is present.[2] *See id.* at 104 & n. 10, 96 S.Ct. 321. Rather, the police must respect fully the suspect's exercise of this right, and the interrogators must "counteract[ ] the coercive pressures of the custodial setting" through steps such as ceasing the interrogation, allowing a significant amount of time to pass before resuming questioning, and reissuing the *Miranda* warnings. *See id.* at 104–05, 96 S.Ct. 321.

In the right to counsel context, the Supreme Court instituted a "clear articulation rule" to trigger the safeguards envisioned by the *Miranda* right to counsel. *See Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). If a

---

2. The law has developed differently in the area of a request for counsel. Building on a distinction first articulated in *Miranda,* 384 U.S. at 473–74, 86 S.Ct. 1602, the Supreme Court provides greater procedural safeguards for the right to counsel than for the right to remain silent. *Compare Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (holding that once the right to counsel is invoked, custodial interrogation must cease until the suspect's attorney is present) *with Mosley,* 423 U.S. at 104 & n. 10, 96 S.Ct. 321 (distinguishing right to remain silent from right to counsel, and finding that once right to remain silent is invoked, police must scrupulously honor the exercise of that right). *See also Solem v. Stumes,* 465 U.S. 638, 648, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984) (not-

ing distinction between right to counsel and right to remain silent); *Minnick v. Mississippi,* 498 U.S. 146, 165, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) (Scalia, J., dissenting) (criticizing distinction between right to counsel and right to remain silent in this context).

The Supreme Court has not explained with precision the reason for distinguishing between these two rights. The Supreme Court of Minnesota suggests that the distinction exists because when a person invokes the right to counsel, she expresses an unwillingness to deal with the police at all except through an attorney, while a person who invokes the right to remain silent retains control over her interactions with the police. *See State v. Williams,* 535 N.W.2d 277, 284–85 (Minn.1995).

suspect clearly requests an attorney, then no further questioning may occur until an attorney has been made available or the suspect reinitiates the conversation. *See id.* at 458, 114 S.Ct. 2350; *see also Romero*, 953 P.2d at 554. However, if the suspect's request is ambiguous or equivocal, then police need not make an effort to clarify the statement and are free to continue the questioning. *See Davis*, 512 U.S. at 461–62, 114 S.Ct. 2350.

To determine whether a suspect clearly invoked his constitutional right to an attorney, the Supreme Court employed the objective standard of a reasonable police officer under the circumstances. *See id.* at 459, 114 S.Ct. 2350. "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* (emphasis in original). The reasonableness standard provides law enforcement with a well-defined, common sense rule. *See id.* at 461, 114 S.Ct. 2350. As the Supreme Court noted, police officers should not be "forced to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Id.*

We adopt this reasonableness rule in the context of invocation of the right to remain silent—before the police must scrupulously honor a suspect's right to remain silent, the suspect must clearly articulate that right so that a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect wants to exercise his right to cut off further questioning. In so doing we follow the majority of other states that have considered the application of the "clear articulation rule" to the right to remain silent. *See, e.g., State v. Owen*, 696 So.2d 715, 717–18 (Fla.1997);

*State v. Donesay*, 265 Kan. 60, 959 P.2d 862, 871–72 (1998); *State v. King*, 708 A.2d 1014, 1017 (Me.1998); *Williams*, 535 N.W.2d at 285.[3] The majority of federal jurisdictions considering the issue have applied the *Davis* rule to the right to remain silent as well. *See, e.g., United States v. Ramirez*, 79 F.3d 298, 305 (2d Cir.1996); *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir.1995); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir.1994).[4]

The Minnesota Supreme Court in *Williams* outlined the rationale for extending *Davis* to right to silence cases when it explained that fewer prophylactic procedures are required in the right to remain silent context.

> When an accused attempts to invoke his right to counsel, he indicates that he feels comfortable dealing with the authorities only with the assistance of counsel. That is not the case in the right to remain silent context, and therefore, fewer procedural safeguards are appropriate when the accused invokes the right to remain silent. Because the Supreme Court has held that the Constitution does not require police officers to confine their questioning to clarifying questions when an accused ambiguously or equivocally attempts to invoke his right to counsel, it follows by even greater logic that the Constitution does not require such a clarifying approach when an accused ambiguously or equivocally attempts to invoke his right to remain silent.

535 N.W.2d at 284–85 (citations omitted).

A "clear articulation rule" requires a suspect to act to protect herself to some extent because the suspect must clearly express a desire to invoke her rights; however, as the Supreme Court in *Davis*, stated:

> [R]equiring a clear assertion of the right to counsel might disadvantage some suspects

---

**3.** *See also Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555, 565 (1995); *In re Frederick C.*, 8 Neb.App. 343, 594 N.W.2d 294, 302 (1999); *State v. Greybull*, 579 N.W.2d 161, 163 (N.D. 1998); *State v. Reed*, 332 S.C. 35, 503 S.E.2d 747, 750 (1998); *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex.Crim.App.1996).

**4.** *See also United States v. Hicks*, 967 F.Supp. 242, 250 (E.D.Mich.1997); *United States v. An-*

*drade*, 925 F.Supp. 71, 79–80 (D.Mass.1996); *United States v. Sanchez*, 866 F.Supp. 1542, 1558–59 (D.Kan.1994).

We note that the Fifth and Ninth Circuits have declined to reach the issue of whether *Davis* applies to the right to remain silent. *See Barnes v. Johnson*, 160 F.3d 218, 225 (5th Cir.1998); *Evans v. Demosthenes*, 98 F.3d 1174, 1176 (9th Cir.1996).

who—because of fear, intimidation, lack of linguistic skills, or a variety of other reasons—will not clearly articulate their right to counsel although they actually want a lawyer present. But the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves.

512 U.S. at 460, 114 S.Ct. 2350. Other courts have agreed, finding that requiring sufficient clarity from suspects is not unduly burdensome on their rights. *See Andrade,* 925 F.Supp. at 80.

 Although a suspect must articulate her desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to cut off questioning, we do not require the suspect to use special or ritualistic phrases. *See Quinn v. United States,* 349 U.S. 155, 162, 75 S.Ct. 668, 99 L.Ed. 964 (1955) (stating that no special combination of words is needed to invoke the right against self-incrimination). To invoke the right to remain silent, a suspect need not "speak with the discrimination of an Oxford don." *Davis,* 512 U.S. at 459, 114 S.Ct. 2350; *see also Romero,* 953 P.2d at 556. Further, because suspects may have only limited skills for verbalizing their wishes in a custodial setting, a court must give "a broad, rather than a narrow, interpretation" to requests to cut off questioning. *See Romero,* 953 P.2d at 554–55 (directing courts to interpret requests for counsel broadly; quoting *People v. Kleber,* 859 P.2d 1361, 1363 (Colo.1993) and *Michigan v. Jackson,* 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986)).

**B. Totality of the Circumstances Inquiry**

 Having adopted the clear articulation rule, we turn to a discussion of how a trial court must determine whether a suspect's statement is a clear assertion of her right to remain silent. The scope of a trial court's analysis should not be limited to the words as they appear on their face. A trial court should consider the words spoken by the defendant and the plain meaning of those words, but the court should also consider the totality of the circumstances surrounding the statement in order to assess the words in context.

We have previously directed trial courts to examine the totality of the circumstances to assess how a reasonable officer in the circumstances would perceive a statement that might be a request for the assistance of counsel. *See Romero,* 953 P.2d at 555 (finding that a reasonable officer would have understood the statement, "I should talk to a lawyer . . . because I do want to go to trial on this" to be a clear request for counsel given the surrounding circumstances). "The legal standard is objective—whether in the context of question and answer, the suspect's responses reasonably could be construed by a police officer to mean that the suspect wanted a lawyer." *Id.* at 556. This totality of the circumstances analysis applies equally to the right to remain silent.[5]

 The trial court must review a wide range of factors on a case-by-case basis in order to consider the totality of the circumstances. The trial court should assess the words spoken by the defendant and the interrogating officer, the officer's response to the suspect's words, the speech patterns of the suspect, the content of the interrogation, the demeanor and tone of the interrogating officer, the suspect's behavior during questioning, the point at which the suspect invoked the right to remain silent, and who was present during the interrogation. *See Romero,* 953 P.2d at 555–56; *People v. Trujillo,* 938 P.2d 117, 124 (Colo.1997) (employing similar factors to determine whether custodial interrogation had taken place). A court also might consider the questions that drew the statement as well as the officer's response to the statement. *See Johnson,* 56 F.3d at 955.

 Whether an officer's subsequent questions were an attempt to clarify a suspect's wishes may also be part of the totality

5. In so concluding, we join numerous other jurisdictions. *See, e.g., Johnson,* 56 F.3d at 955 ("We consider the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent.");

*Bobo v. Kolb,* 969 F.2d 391, 396 (7th Cir.1992) (stating that courts should "examine the entire context in which the claimant spoke" (quoting *Bradley v. Meachum,* 918 F.2d 338, 342 (2d Cir. 1990))).

of the circumstances analysis. The Supreme Court has not required officers to clarify a suspect's ambiguous invocation of rights, although the Court has indicated that it is often prudent police practice to do so. *See Davis*, 512 U.S. at 461, 114 S.Ct. 2350.

In addition, when assessing the totality of the circumstances a trial court may take into account the fact that suspects may not, due to their particular characteristics and the circumstances of the police interview, request an end to questioning in the most sophisticated or legally proper form. *See Romero*, 953 P.2d at 554 (applying the same principle to requests for counsel). Courts may even take into account a suspect's experience with the criminal justice system, her ability to understand questions, and her ability to verbalize her wants and needs. *Cf. id.* at 554–55 (noting examples of personal characteristics that may be pertinent to inquiry into clarity of suspect's invocation of right to counsel).

The factors we list here are not exhaustive. A trial court need not make specific findings with respect to each of these factors, and no single factor is controlling. A court may consider many or all of these factors, and a court may consider other relevant factors that we have not mentioned, as long as the court demonstrates that it has considered the totality of the circumstances. *See Quezada*, 731 P.2d at 734 (finding that *Mosley* factors are not exhaustive of inquiry into whether police scrupulously honor a suspect's right to remain silent, and that totality of circumstances inquiry must be made on case-by-case basis).

## VI. APPLICATION OF "CLEAR ARTICULATION" RULE

Relying on the two legal principles just discussed, we now examine the trial court's decision in this case. First, we must determine whether the trial court considered the totality of the circumstances when it ruled that Arroya's statement, "I don't wanna talk no more," meant that she wanted to exercise her right to remain silent. Second, we must examine whether the trial court properly ruled that under these circumstances a reasonable officer would have understood Arroya's statement as a clear articulation of her intent to exercise this right.

Here, the trial court determined that by saying, "I don't wanna talk no more," Arroya clearly invoked the right to remain silent, and that given the circumstances surrounding the questioning, she meant what she said. To support this finding, the trial court detailed the circumstances surrounding Arroya's statement, considering all but one of the factors we suggest as relevant for determining whether a defendant has unequivocally invoked her right to remain silent. The trial court took into account:

(1) the words spoken by Arroya—after making serious admissions, Arroya stated, "I don't wanna talk no more";

(2) the words spoken by the detective—he asked if she wanted a break and ceased questioning once Arroya stated that she did not want to "talk no more";

(3) the detective's response to Arroya's statement—he immediately ceased questioning;

(4) the content of the interrogation—the court found that the detective had not used "unscrupulous" tactics during the interrogation, and the court did not find that the questioning addressed any topics or crimes other than the child's death;

(5) the detective's demeanor and tone—during the questioning he was "gentle" and "solicitous";

(6) Arroya's behavior during questioning—she was less responsive during the second interview, her answers were frequently inaudible on the tape, she made incriminatory admissions, and her statement "I don't wanna talk no more" is loud enough to be heard on the tape;

(7) the point at which Arroya invoked her right to remain silent—after becoming less responsive and just after making a series of incriminating statements, Arroya states that she does not want to talk any more when the detective asks if she wants a break;

(8) who was present at the interrogation—the detective, a district attorney, and Arroya were present;

(9) Arroya's level of legal sophistication—she had little or no earlier contact with the criminal justice system; and

(10) whether the detective attempted to clarify Arroya's statement—he made no attempt to clarify her statement when questioning resumed after the short break.

■■ The only factor we list that the trial court did not consider was the "speech patterns of the suspect." *See, e.g., Romero,* 953 P.2d at 556 (approving of trial court's analysis of defendant's "pattern of speech," noting defendant's use of expletives and slang, improper construction of sentences, and general lack of grammatical skills). However, because a trial court need not make specific findings with respect to each individual factor in its assessment of the circumstances, this omission does not render the court's analysis inadequate.

■■ Although reasonable minds could differ about whether Arroya's statement was a clear invocation of her right to remain silent, the trial court's findings are adequately supported by evidence in the record. At the hearing, the trial court stated that it would view the videotapes of the interrogation, not merely consider the words spoken by Arroya on the transcript, and the court was clearly familiar with all of the circumstances surrounding Arroya's statement. The trial court stated several times that Arroya's statement was a clear invocation of her right to remain silent and relied on a detailed summary of the facts and circumstances surrounding the statement for its ruling. Because we must defer to a trial court's findings of fact when supported by sufficient evidence in the record, we do not disturb the trial court's findings here.

■■ Even though the trial court did not expressly state that under these circumstances a reasonable police officer would have understood Arroya's statement as a clear articulation of her right to remain silent, we are able to make this inference from the detailed findings made in this case. The trial court's order states in three places that Arroya "clearly invoked her right to remain silent." The court noted that the detective stopped questioning her immediately after she stated that she wanted to stop talking, demonstrating that the detective himself in-

terpreted the statement to mean that Arroya wanted the questioning to cease. Although the detective testified that his interpretation of Arroya's statement was that she wanted to take a break, the trial court's repeated findings that the words were a clear invocation of the right to remain silent apparently are rejections of the detective's subjective interpretation of Arroya's words. Rather, the court's finding that she clearly invoked her right to remain silent permits us to infer what the words would have meant to a reasonable police officer at the time they were spoken—i.e., that Arroya wished at that time to exercise her right to remain silent consistent with the *Miranda* advisements given to her earlier by this officer.

## VII. WHETHER THE EXERCISE OF THE RIGHT WAS SCRUPULOUSLY HONORED

Having affirmed the trial court's ruling that Arroya clearly invoked her right to cut off questioning, we turn to the People's contention that the court erred by ruling that the police failed to honor scrupulously Arroya's exercise of this right. The People argue that the court "mechanically applied the four factors of *Mosley*" and failed to consider the totality of the circumstances surrounding the resumption of questioning. However, because the trial court considered the totality of the circumstances following Arroya's statement and found that the police took no steps to respect fully Arroya's unambiguous request, we affirm the trial court's decision.

■■ If a suspect ambiguously or equivocally invokes her right to cut off questioning, then the police have no duty to clarify her statement or to take any steps to respect fully the suspect's right to remain silent. *See Davis,* 512 U.S. at 461, 114 S.Ct. 2350 (declining to adopt a rule requiring officers to clarify ambiguous requests for counsel). In such a situation, the police may continue questioning a suspect without being required to do more. On the other hand, once the right to remain silent is invoked, this right must be scrupulously honored and the police may resume questioning only if the police act under the circumstances to respect fully the assertion by the suspect of this

right. *See Mosley,* 423 U.S. at 104, 96 S.Ct. 321; *Quezada,* 731 P.2d at 732. In other words, once the right to remain silent is clearly articulated, then some additional circumstances must occur before police resume questioning—examples, by way of illustration only, may include: if the suspect volunteers to continue answering questions; if a significant amount of time passes; if the police clarify the suspect's earlier assertion of the right; or if the police re-advise the suspect of her rights under *Miranda;* or some appropriate combination of these circumstances. If no significant factual event occurs to demonstrate that the suspect chose to resume answering questions after clearly asserting the right to remain silent, then the *Miranda* right to cut off questioning was not "scrupulously honored."

In *Quezada,* we adopted the *Mosley* holding requiring that a trial court review the totality of the circumstances to determine whether the police scrupulously honored a suspect's right to remain silent. *Quezada,* 731 P.2d at 732–33. We said in *Quezada* that a court must consider the totality of the circumstances surrounding the conduct of the police, and we highlighted four factors of particular significance: (1) the suspect's initial advisement and acknowledgement of his rights; (2) whether the officer immediately ceased questioning once the right to silence was invoked and did not attempt immediately to resume questioning; (3) whether the subsequent interrogation was by the same officer, in the same location, and about the same crime as the first interrogation; and (4) whether the suspect was re-advised of his rights at the outset of the subsequent interrogation. *See id.*

▇ In this case, the court considered the following facts: (1) after Arroya stated she did not want to "talk no more," the detective immediately stopped the questioning; (2) Arroya was given a very short break; (3) she was not re-advised of her rights when the questioning resumed; (4) the same detective resumed questioning Arroya for the same crime about which she had sought to cut off questioning; and (5) the detective made no effort to clarify or to discuss Arroya's statement that she did not want to talk any more. The People do not dispute these facts.

In the trial court's review of the relevant facts of this interrogation, the police did nothing to respect fully Arroya's clearly asserted right to cut off questioning other than to give her a short break from the interrogation—questioning resumed as if her request to stop the interrogation was ambiguous. Thus, when the trial court ruled that the police failed to take appropriate steps before re-initiating questioning under the guidelines set forth in *Quezada,* the court's assessment was not "mechanistic" because it carefully took into account the totality of the circumstances of the interrogation.

We disagree with the People's position that the trial court failed to consider all of the circumstances following Arroya's statement that she did not want to "talk no more." The trial court reviewed a variety of facts that are not in dispute. The court's finding that no additional circumstances occurred that demonstrated Arroya's intent to revoke her earlier exercise of the right to remain silent appears crucial to its conclusion. Because after questioning stopped, nothing occurred other than the short break given to Arroya, the trial court's conclusion that the police failed to take steps to re-initiate questioning is logical and not erroneous as a matter of law. Hence, we affirm the trial court's ruling.

## VIII. CONCLUSION

To summarize, the evidence presented concerning the words spoken by Arroya and the circumstances surrounding her words supports the trial court's factual determination that Arroya unambiguously invoked her right to remain silent as well as the inference that a reasonable officer would have viewed her words as such an invocation. The trial court based its findings on all but one of the factors we suggest as appropriate to assess whether a suspect has asserted her right to remain silent and cut off questioning under *Miranda.* Thus, the trial court considered the "totality of the circumstances" in determining that Arroya clearly was exercising her right to remain silent. Because the trial court made adequate predicate factual determinations, we affirm the trial court's ruling that the police failed to take steps to honor

scrupulously Arroya's exercise of her right to cut off questioning. Hence, we affirm the trial court's decision, and we remand the case for further proceedings consistent with this opinion.

Justice KOURLIS, concurring in part and dissenting in part:

I concur with the majority's statement of the "clear articulation rule" as the proper objective test for assessing whether a suspect has invoked her right to remain silent. However, I dissent as to the application of the test to these facts. Because the trial court did not utilize the correct test to determine whether Arroya invoked her right to remain silent, I would remand the case for further findings consistent with this newly defined standard.

## I.

The admissibility of Arroya's confession poses two distinct and separate factual and legal inquiries. First, the court must determine whether Arroya invoked her right to remain silent, by applying the "clear articulation rule" as outlined in *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Second, the court must assess whether the police scrupulously honored that invocation by applying the factors outlined in *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) and *People v. Quezada,* 731 P.2d 730, 733–34 (Colo.1987). Although both inquiries require the court to assess the totality of the circumstances, a court must address each test separately in order to determine the admissibility of a custodial statement. In short, the suspect must clearly articulate a desire to cease questioning before the investigating officers have any duty to scrupulously honor that request.

In my view, the trial court in this case intermixed the two questions. Indeed, the majority makes use of several of the trial court's findings on the second question in order to analyze the first question. I would urge their separate and distinct treatment, at the trial court level and before this court.

## A.

Under the "clear articulation rule" outlined by the majority, when a suspect unambigu-

ously invokes her constitutional rights, the interrogation must cease. *See Davis,* 512 U.S. at 458, 114 S.Ct. 2350. But if a suspect's invocation is ambiguous, police are not required to terminate questioning. *See id.* at 462, 114 S.Ct. 2350. An ambiguous communication is one giving rise to opposing inferences. *See People v. Romero,* 953 P.2d 550, 554 (Colo.1998). Only an unambiguous or unequivocal invocation of the right to remain silent triggers *Miranda* 's protections. *See State v. Williams,* 535 N.W.2d 277, 285 (Minn.1995).

On the first question of whether Arroya unambiguously invoked her constitutional rights, the standard that we today adopt calls upon the trial court to determine whether a reasonable police officer would have viewed the statement of the suspect as an invocation of the right to cease questioning. *See Davis,* 512 U.S. at 459, 114 S.Ct. 2350. Because *Miranda* is a prophylactic rule implemented to regulate police conduct, reviewing courts should step into the shoes of the interrogating officer working with that particular suspect. As the majority explains, this is an objective standard: "whether in the context of question and answer, the suspect's responses reasonably could be construed by a police officer to mean that the suspect" wishes to remain silent. *Romero,* 953 P.2d at 556.

Further, in order for the trial court to determine what a reasonable officer would have understood in that particular situation, courts must consider the totality of the circumstances. *See id.* at 555. It is not enough to look at the words of the suspect standing alone.

Discerning whether a defendant made a clear statement under the totality of the circumstances requires consideration of the questions that preceded the statement as well as the officer's response to the statement. In *United States v. Johnson,* the court weighed the fact that the statements at issue were not made in response to questions about the crime, but in response to questions about whether the defendant wished to waive his rights. 56 F.3d 947, 955 (8th Cir.1995). The court in *State v. Greybull* found that the defendant's "comments about not saying any-

thing were equally unclear, especially since she continued to respond to the officers' questions." 579 N.W.2d 161, 163 (N.D.1998); *see also Bobo v. Kolb,* 969 F.2d 391, 397 (7th Cir.1992) (considering that both before and after the alleged invocation of rights, the defendant freely answered questions).[1]

### B.

Only after a trial court has determined that a suspect invoked her right to remain silent, should the court turn to the next question: whether the police scrupulously honored the invocation. *See Mosley,* 423 U.S. at 104, 96 S.Ct. 321.

### II.

The trial court in this case applied the wrong standard. In concluding that Arroya invoked her constitutional rights, the trial court considered only the specific words spoken by the defendant, which the trial court interpreted as a demand to cease questioning. Although the trial court considered the context of Arroya's statements in determining whether the officer employed unscrupulous interrogation tactics and whether he scrupulously honored her invocation of the right to remain silent, it did not look to the totality of the circumstances in first determining whether Arroya clearly invoked that right. The trial court also did not consider what a reasonable officer in those circumstances would have understood the defendant's statement to mean.

The trial court reviewed the transcripts and videotapes of the interrogations and then specifically ruled that,

[t]he very first part of the advisement given by Detective Neil stated that Defendant had a right to remain silent. While she had voluntarily agreed to speak and had voluntarily spoken with the detective for some period of time, the statement "I don't wanna talk no more," is a clear invocation of her right to remain silent. The

court concludes that her statement is an invocation of the right to remain silent and triggers the steps which must be taken to re-initiate conversations with defendant which are outlined in the *Mosley* and *Quezada* [sic].

This is the trial court's only analysis of Arroya's invocation of her right to remain silent. The remainder of the trial court's ruling focuses on whether the police scrupulously honored Arroya's invocation. Although the trial court mentions three times in passing that her invocation was unambiguous, it did not explain how it reached that determination. In the totality of the circumstances analysis adopted by the majority today, I cannot agree that the statement was an unambiguous demand to cease questioning.

The ten specific trial court findings cited by the majority were made in the context of other issues. For example, the trial court noted the fact that Arroya had no experience with the criminal justice system as relevant to the issue of whether the detective needed to reissue *Miranda* warnings to Arroya. The trial court made findings as to the words spoken by the detective, his response to Arroya's statement, his demeanor and tone, the content of the interrogation, the point in the interrogation at which the defendant invoked her right to remain silent, and Arroya's behavior during questioning in conjunction with the court's evaluation of the police interrogation tactics. Additionally, the court made findings about whether the detective attempted to clarify Arroya's statement in response to the claim that the police failed to scrupulously honor her rights. The trial court did not direct these findings at determining whether the statement was a clear invocation of Arroya's rights.

When placed in the context in which they were spoken, the words, "I don't wanna talk no more," appear ambiguous. It is possible

---

1. In the right to counsel context, the Supreme Court has held that when a suspect clearly invokes his Fifth Amendment protections, any responses to questions subsequent to that invocation cannot be used to cast doubt on the clarity of the initial request. *See Smith v. Illinois,* 469 U.S. 91, 97, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984). Rather, subsequent statements are relevant only as to whether the defendant waived his

invocation of rights. *See id.* at 98, 105 S.Ct. 490. Lower courts have limited this holding to instances where the suspect clearly invoked his rights. If the suspect makes an ambiguous request, then *Smith* does not apply and courts may consider subsequent statements made by the suspect. *See, e.g., State v. Thomas,* 698 S.W.2d 942, 947–48 (Mo.Ct.App.1985), *Jamail v. State,* 787 S.W.2d 372, 377 (Tex.Crim.App.1990).

that the words could have been understood more than one way—as a desire to take a break from questioning, or as a desire to terminate questioning. The trial court made no findings on that point.

Earlier in the second interview, Detective Neil asked Arroya if she wished to take a break, and she declined. When the Detective again asked, "Do you wanna break?", Arroya then said, "I don't wanna talk no more." Immediately after Arroya made this statement, Detective Neil continued to ask questions about taking a break:

Neil: Do you wanna break?

Arroya: (Crying) I don't wanna talk no more.

Neil: We'll take a break. Do you want a glass o' water or do you smoke?

Arroya: Yes.

Neil: Do wanna cigarette? I don't know who smokes here but I'll try to find one.

Arroya: (Heavy sighing)

Neil: Want something to drink?

Arroya: No, not really.

Neil: Restroom? You're okay?

Arroya: (No verbal response)

Neil: 'kay. We'll break.

Following the short break in the interview, Detective Neil asked Arroya if she felt better, and then continued the interrogation. Arroya did not object. Arroya's overall demeanor was calmer and more composed following the break. Given the question which drew Arroya's statement and the line of questioning that followed the break, it may have been reasonable for Detective Neil to understand that Arroya wished only a break from, not an end to, the interrogation. His questions immediately following her statement also could have been an attempt to clarify whether she did, in fact, desire a break.

Other circumstances contribute to the ambiguity. Prior to the interrogation, Arroya signed a form indicating that she waived her rights, and she appeared to have understood that she voluntarily agreed to speak with police. The videotape of the second interview demonstrates that at the beginning of the session, Arroya was unresponsive, refusing to answer many of Detective Neil's questions, and the answers she did give were often unintelligible. She slumped in her chair, refused to make eye contact, and cried intermittently. As the interview continued, however, Arroya became increasingly responsive and she answered most of Detective Neil's questions even though she refused to make eye contact. After the break, she continued to talk with a much calmer demeanor, describing how she killed her son. At no point in the interviews did Arroya indicate that she wanted to cut off questioning or request an attorney.

The primary issue in this case is a mixed question of law and fact. Although this court affords considerable deference to trial court findings of fact, it has de novo review over the proper legal standard and a trial court's legal conclusions. *See Romero*, 953 P.2d at 555. Because Colorado appellate courts had not yet clarified this point of law, the trial court did not employ the proper standard in its analysis. Although the trial court considered the totality of the circumstances regarding other aspects of Arroya's interrogation, such as whether Detective Neil used unscrupulous interrogation tactics, the trial court opinion provides no evidence that the court considered the context of the statement in assessing whether Arroya invoked her right to remain silent. The trial court also made no findings as to how a reasonable officer in those circumstances would have understood Arroya's statement.

After reviewing the record, including the videotapes of the interrogations, I find Arroya's statement ambiguous. Since the trial court made no findings concerning the circumstances or facts that led it to conclude that the statement was a clear invocation of Arroya's right to remain silent, I would remand the case for application of the proper standard to the facts of the case. Because it is unclear whether Arroya sufficiently invoked her right to remain silent such that Detective Neil had any obligation to honor such a request, I would not reach the next step in the analysis of whether the police scrupulously honored Arroya's invocation.

Chief Justice MULLARKEY and Justice RICE join in this concurrence and dissent.